# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00140-CR

**Armando Moran, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 403RD JUDICIAL DISTRICT NO. 3021024, HONORABLE BRENDA P. KENNEDY, JUDGE PRESIDING

## O P I N I O N

A jury convicted Armando Moran of murder, and the court sentenced him to fifty years in prison. In this appeal, Moran raises a single point of error contending that the trial court improperly admitted his inculpatory statements. Because we hold that Moran's statements were the product of custodial interrogation by the police after he had invoked his right to counsel, we reverse the judgment of conviction and remand for further proceedings.

## BACKGROUND

Moran's only point of error concerns the admission of his two written statements into evidence. Moran was convicted of the murder of Tony Alcantar. At the time, Moran was staying in Tony Alcantar's apartment along with Alcantar's fourteen-year-old daughter V.A.,[1] Alcantar's ex-

---

[1] Moran, who was nineteen years old, had met V.A. on the internet, and the two were dating.

wife Hilda Alcantar, and her sons Jose and Jerry Garza. Jose's fourteen-year-old girlfriend, J.V., was also present during the events in question. Tony and Hilda Alcantar had a loud argument on the evening of May 17, 2002, during which Tony told Hilda and the others to move out of the apartment. Afterward, Moran left the apartment with Tony Alcantar. Moran returned momentarily and retrieved Tony Alcantar's gun. Later that evening, Moran returned alone and told Hilda Alcantar that he had shot Tony Alcantar in the head and left him near Town Lake.

Following the murder, Moran helped the others move their possessions out of Tony Alcantar's apartment, and they all spent the night at a motel. The next morning, Moran, Hilda Alcantar, and V.A. took a bus to Laredo; Jerry and Jose took Jose's girlfriend J.V. home and then drove to Laredo. Tony Alcantar's body was found near Town Lake that morning. He had been shot in the head, and his pistol was found on the ground about 20 feet away. The police identified the body from a driver's license found at the scene and subsequently sealed off Tony Alcantar's apartment. Later in the day, J.V.'s father called the police after visiting the apartment and seeing that it had been sealed as a crime scene. J.V. then told the police what had happened the night before.

Laredo police were contacted, and they located Moran, Hilda Alcantar, her sons, and V.A. All were interviewed at the Laredo police station. As a result of these interviews, Tony Alcantar's car was found by Austin police in a supermarket parking lot. Police found Tony Alcantar's jewelry hidden in the tire well of the car.

Laredo detectives Primo Guzman and Martin Guerra interviewed Moran. Guzman testified about his interview of Moran in a pretrial hearing and at Moran's trial. Guzman stated that he informed Moran of his rights, explained that he was assisting the Austin Police Department in a

2

homicide investigation, and that Moran was a suspect. At that point, Moran told Guzman that he wanted to speak with an attorney. Guzman testified that he then told Moran, "That's fine, that was his right," but added that the detectives had already interviewed Hilda, Jose, and Jerry. Guzman stated that he and Guerra then got up and began walking toward the door. Guzman described Moran's response:

> As we reached for the—I reached for the door, and Guerra was right behind me. I just opened it up. And [Moran] said, "*simon*," which means, yes, I will tell you, I will tell you what happened.

Guzman and Guerra returned to their seats and Moran began to discuss the murder. Guzman and Guerra then asked Moran to write out a statement. Moran was given a form entitled "Voluntary Written Statement." He placed his initials next to the following statements on that form:

(1) I have the right to remain silent and not make any statement at all and that any statement I make may be used against me in court;

(2) Any statement I make may be used in evidence against me in court;

(3) I have the right to have a lawyer present to advise me either prior to any questioning or during any questioning;

(4) If I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during questioning; and

(5) I have the right to terminate this interview at any time.

Guzman and Guerra left the room while Moran wrote out a statement. In his first statement, Moran wrote that he went with Tony Alcantar to Town Lake and the two began arguing. Moran wrote that

3

the gun fell out of his jacket during the argument. Tony Alcantar grabbed for the gun, and Moran shot Tony Alcantar as Tony was running.

Guzman testified that he returned to the room after Moran had signed the statement and informed Moran that there might have been an eyewitness to the shooting.[2] This prompted Moran to write a second statement. In this statement, Moran wrote that after he and Tony Alcantar had been fighting at Town Lake for "a good hour," Moran "ran in front of him, pulled the trigger and ran." He then left the gun at the scene of the murder.

Moran also testified at the pretrial hearing. He stated that he was intoxicated during the questioning and that he had not slept the since the day before. On direct examination, Moran stated that he did not recall making an oral statement but did remember making the written statements. On cross examination, Moran testified that he remembered informing Guzman that he wanted to speak with an attorney. Moran was then asked about what happened next:

Q. Do you remember what, what happened after you indicated you wanted to speak with an attorney?

A. Well, I remember—I don't remember what was said. I just remember him starting to walk out of the door.

Q. All right. What if anything do you remember happening when he started to walk out the door?

A. I believe I told him yes, I'll say something.

Q. And why did you say that?

A. Because I felt that, you know, I would be able to leave.

_____

[2] In fact, Guzman had no information regarding the presence of an eyewitness to the murder.

4

Q. What made you think that you would be able to leave if you said something versus not saying it?

A. Because I wasn't thinking clearly, sir.

Q. All right. So it wasn't anything that Detective Guzman said? It was just because you weren't thinking clearly?

A. Well, he said, you know, make it easier on yourself.

Q. When did he say that?

A. Right before he got up.

Moran added that his statement that he would tell Guzman what happened was made directly after Guzman's suggestion that Moran make it easier on himself.

Both of Moran's written statements were introduced at trial. Although witnesses testified that Moran made several oral statements to the police, the State did not attempt to introduce those statements at trial.

## DISCUSSION

In his only point of error, Moran contends that the trial court erred by failing to suppress his written statements, which were the product of custodial interrogation after he had invoked his right to counsel. In reviewing a ruling on a motion to suppress, we give almost total deference to the trial court's determination of historical facts. *See Balentine v. State*, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002). We review *de novo* mixed questions of law and fact that do not turn on an evaluation of credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *Hayes v. State*, 132 S.W.3d 147, 151 (Tex. App.—Austin 2004, no pet.). The trial court entered findings of fact and conclusions of law stating only that Moran's written statements were

5

freely and voluntarily made after he knowingly, intelligently, and voluntarily waived his *Miranda* rights.[3]

**Admission of Moran's Written Statements**

Moran relies on the "bright-line rule" set forth by the United States Supreme Court in *Edwards v. Arizona*; once a suspect invokes his right to counsel, all custodial interrogation must cease. *See* 451 U.S. 477, 484-85 (1981); *Cross v. State*, 144 S.W.3d 521, 526 (Tex. Crim. App. 2004); *see also Miranda v. Arizona*, 384 U.S. 436, 474 (1966) ("If the individual states that he wants an attorney, the interrogation must cease until an attorney is present."). The Court stated that the purpose of the rule is to counteract the inherently compelling pressures of custodial interrogation and to permit a full opportunity for an individual to exercise the privilege against self incrimination. *Arizona v. Roberson*, 486 U.S. 675, 681 (1988) (citing *Miranda*, 384 U.S. at 467). "[T]he accused having expressed his own view that he is not competent to deal with the authorities without legal advice, a later decision at the authorities' insistence to make a statement without counsel's presence may properly be viewed with skepticism." *Id*.

The United States Supreme Court has repeatedly emphasized the virtue of a bright-line rule in cases following *Edwards*. *See Roberson*, 486 U.S. at 681; *Smith v. Illinois*, 469 U.S. 91, 98 (1984). The Court explained that the value of "informing police and prosecutors with specificity as to what they may do in conducting custodial interrogation, and of informing courts under what

---

[3] These findings were made in compliance with our memorandum opinion dated April 19, 2005. In that opinion we noted that article 38.22, section 6 of the code of criminal procedure requires a trial court to make findings of fact and conclusions of law as to whether a challenged statement was made voluntarily. *See Urias v. State*, 155 S.W.3d 141, 142 (Tex. Crim. App. 2004).

circumstances statements made during such interrogation are admissible," outweighs the burden of excluding what may otherwise be relevant and trustworthy evidence. *Roberson,* 486 U.S. at 681-82; *see also Smith*, 469 U.S. at 98 (bright-line prohibition needed to prevent authorities from badgering or overreaching, explicitly or subtly, deliberately or unintentionally); *McCambridge v. State*, 778 S.W.2d 70, 76 (Tex. Crim. App. 1989) (purpose of *Edwards* to establish rule immune from vagaries that invariably accompany diverse factual encounters).

This bright-line rule only applies to the actions of the police. A suspect may waive his previously invoked right to counsel:

> A suspect's invocation of his right to counsel acts like a protective *Edwards* bubble, insulating him from any further police-initiated questioning. Only the suspect himself can burst that bubble by both initiating communications with police and expressly waiving his right to counsel. Once that bubble is burst, however, *Edwards* disappears, and the police are free to reinitiate any future communications and obtain any further statements as long as each statement is voluntarily made after the waiver of Miranda rights.

*Cross*, 144 S.W.3d at 529. In *Cross*, the court of criminal appeals recognized a two-step test for whether a suspect has waived a previously invoked right to counsel. *See id.* at 527 (adopting test set forth in *Oregon v. Bradshaw*, 462 U.S. 1039, 1044-45 (1983)). In order to prove the waiver of a previously invoked right to counsel, the State must show (1) the suspect reinitiated communication with the police, and (2) after reinitiating communication, he validly waived his right to counsel. *See id*.

Here, the record reflects, and the State does not dispute, that Moran was in police custody and invoked his right to counsel prior to making any inculpatory statement to the police.

7

Thus, we will apply the two-part test discussed in *Cross*. *See id.*, 144 S.W.3d at 527. We first determine whether Moran reinitiated communication with the police or if his statements were in response to further interrogation. *See id*. Although the trial court found that Moran validly waived his right to counsel prior to making the written statements at issue, the findings of fact and conclusions of law do not address whether Moran reinitiated communication with the police.

After Moran invoked his right to counsel, Guzman told Moran, "that was his right . . . we had already spoke[n] to Hilda, we spoke to Jose Luis and Jerry." Guzman and Guerra then got up from their chairs and began walking toward the door. At this point, Moran decided to make a statement.[4] Moran contends he responded to Guzman's comment, which was the equivalent of interrogation, and therefore, he did not "reinitiate" communication with the police.

Interrogation is not limited to questions; any words or actions by police may be considered interrogation if the police "*should have known* [they] were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 466 U.S. 291, 302 (1980); *see Jefferson v. State*, 974 S.W.2d 887, 890 (Tex. App.—Austin 1998, no pet). But not all interactions between the police and a suspect in custody will constitute interrogation. *See Camarillo v. State*, 82 S.W.3d 529, 535 (Tex. App.—Austin 2002, no pet.). We do not look at the statements made by police in a vacuum; rather

---

[4] Although Moran testified that Guzman told him to "make it easier on himself," we give deference to the trial court's determination of historical facts. *See Balentine v. State*, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002). Because the trial court denied the motion to suppress, we will assume that the trial court believed Guzman's account of the events leading up to Moran's inculpatory statements. However, there is no evidence in the record of Guzman's intentions in making his comment. Thus, our consideration of the law, as applied to Guzman's account of the questioning, is *de novo* because it does not turn on an evaluation of his credibility and demeanor. *See Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *Hayes v. State*, 132 S.W.3d 147, 151 (Tex. App.—Austin 2004, no pet.).

we construe those statements in light of the circumstances of the interaction between the police and the accused on each particular occasion. *See Morris v. State*, 897 S.W.2d 528, 532 (Tex. App.—El Paso 1995, no pet.). Where the comments of the police are "designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect." *Innis*, 466 U.S. at 301 n.7.

The court of criminal appeals has discussed those types of questions that will not be found to constitute interrogation. *See Jones v. State*, 795 S.W.2d 171, 174 (Tex. Crim. App. 1990). "Routine inquiries, questions incident to booking, broad general questions such as 'what happened' upon arrival at the scene of a crime, and questions mandated by public safety concerns, e.g., 'where did you hide the weapon' when the weapon has just been hidden in the immediate vicinity" are not interrogation. *Id*. at 174 n.3. Offhand remarks not designed to elicit any kind of response also do not constitute interrogation. *Camarillo*, 82 S.W.3d at 535; *see Innis*, 466 U.S. at 303; *Murray v. State*, 864 S.W.2d 111, 114 (Tex. App.—Texarkana 1993, pet. ref'd) (officer wishing suspect "happy birthday" not interrogation).

The State attempts to characterize Guzman's comment as an "offhand remark" that was not designed to elicit any kind of response. *See Camarillo*, 82 S.W.3d at 535. Guzman did not testify regarding his motivation in making the comment. However, the only possible conclusion from the record is that Guzman's comment, that the officers had spoken with other witnesses, was an attempt to influence Moran to change his mind regarding his invocation of his right to counsel. The comment was made in direct response to Moran's invocation of his right to counsel, and Guzman knew that Moran was already aware of the information provided, that others were also

9

being questioned.  In fact, Guzman's comment to Moran is consistent with recognized interrogation techniques.  Inbau and Reid's seminal work on criminal interrogation[5] explains:

> When two or more persons have collaborated in the commission of a criminal offense and are later apprehended for questioning, there is usually a constant fear on the part of each participant that one of them will "talk" . . . .  This fear and mutual distrust among co-offenders can be made the basis for the effective interrogation technique of "playing one against the other."  Since this tactic involves largely a bluff on the part of the investigator, however, it should be reserved as a last resort, to be used only after other possible tactics have failed to produce the desired result. . . .  The investigator may merely intimate to one offender that the other has confessed, or else the investigator may actually tell the offender so.

Fred E. Inbau et al., Criminal Interrogation & Confessions 292-93 (4th ed. 2004); *see also* Charles E. O'Hara & Gregory L. O'Hara, Fundamentals of Criminal Investigation 144 (6th ed. 1994) (describing technique of "bluff on a split pair" in which two suspects are separated and one is informed the other has talked).  After Moran invoked his right to counsel, Guzman employed the "last resort" interrogation strategy of intimating to Moran that the others had spoken with the police.

This case is distinguishable from the opinions of the Fifth Circuit Court of Appeals and the North Carolina Court of Appeals cited by the State.  *See State v. Jordan*, 495 S.E.2d 732 (N.C. Ct. App. 1998); *Plazinich v. Lynaugh*, 843 F.2d 836 (5th Cir. 1988).  In *Jordan*, a suspect told an officer that he was telling the truth and that he wanted an attorney.  In response, the officer stated, "no you did not that's bullshit, you're lying, and you're going to jail for murder." 495 S.E.2d at 471.  He then ordered the suspect booked into jail.  During the booking process, the suspect decided to

---

[5] The 1963 edition of Inbau and Reid's manual on interrogation was cited extensively by the United States Supreme Court in its opinion in *Miranda v. Arizona*.  *See* 384 U.S. 436, 449-55 (1966) (describing interrogation techniques contained in Fred E. Inbau & John E. Reid, Criminal Interrogation & Confessions (1962)).

make further incriminating statements. *See id*. With little explanation, the court concluded that the officer's comment was not reasonably likely to elicit an inculpatory response. *See id*. at 472.

In *Plazinich*, Cade Plazinich and his "temporary companion" were both arrested. *See* 843 F.2d at 837. Plazinich invoked his right to counsel while being questioned regarding a murder. *See id*. While Plazinich was being returned to jail, he was told by an officer that his female companion had attempted suicide. *See id*. Plazinich responded by asking to speak with an assistant district attorney and that he would consider making a statement. *See id*. *After again speaking with his attorney*, Plazinich made an inculpatory statement claiming sole responsibility for the murder. *See id*.

In both cases, the comment made by the police officer could be construed to serve a purpose other than to induce an inculpatory response, or no purpose at all. In *Jordan*, the statement was simply an expression of anger by the officer. Nor did the certainty of the statement that Jordan was going to jail imply that a more truthful offering by Jordan would produce a more favorable result. *See* 495 S.E.2d at 471. In *Plazinich*, the officers informed Plazinich that his companion had attempted suicide. *See* 843 F.2d at 837. This was information that Plazinich had not confirmed and that Plazinich clearly would have wanted to know. More importantly, Plazinich actually spoke with his attorney after the comment was made but prior to making his inculpatory statement. *See id*.

By contrast, Guzman's comments to Moran can only be construed as inviting an inculpatory response by Moran. Guzman's comment that he had spoken to other witnesses was made immediately after, and in direct response, to Moran's assertion of his right not to make a statement. Importantly, Guzman's comment is consistent with well established interrogation

11

techniques. Although the Fifth Circuit's opinion in *Plazinich* appears to approve of an officer giving a suspect "food for thought" after the right to counsel is invoked, *see* 843 F.2d at 840, the United States Supreme Court has indicated that such a practice is not permitted. *See Innis*, 466 U.S. at 301 n.7. Based on the undisputed record, we conclude that Guzman's comment was an interrogation technique and that Guzman should have known that his comment was reasonably likely to elicit an inculpatory response. *See id*. at 302.

Although Guzman's comment to Moran may seem innocuous, it came only seconds after Moran had invoked his right to counsel. In that context, we hold that this classic interrogation technique was reasonably calculated to elicit an inculpatory response. Characterizing such prompting by the police as an offhand remark would blur the edges of the bright-line rule enunciated in *Edwards*—a step the Supreme Court and Texas courts have declined to take. *See Roberson*, 486 U.S. at 681; *Smith*, 469 U.S. at 98; *Cross*, 144 S.W.3d at 526; *McCambridge*, 778 S.W.2d at 76. We hold that Moran's statement was made in response to continued interrogation and that Moran did not reinitiate communication after he invoked his right to counsel. *See Cross*, 144 S.W.3d at 527. Thus, the trial court erred by admitting Moran's written statements.

**Harm Analysis**

Because we find that Moran's Fifth Amendment right to counsel was violated through the admission of his written statements, we must reverse the conviction unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment. *See* Tex. R. App. P. 44.2(a) (incorporating holding in *Chapman v. California*, 386 U.S. 18, 24 (1967)). The Supreme Court further explained the *Chapman* standard in *Sullivan v. Louisiana*:

12

Harmless-error review looks, we have said, to the basis on which "the jury *actually rested* its verdict." . . . The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee.

508 U.S. 275, 279 (1993) (Scalia, J., opinion for unanimous court). We must be especially cautious when applying the *Chapman* standard in cases where a defendant's own confession was erroneously admitted:

A confession is like no other evidence. Indeed "the defendant's own confession is probably the most probative and damning evidence that can be admitted against him . . . the admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have a profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even when told to do so."

*Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (quoting *Bruton v. United States*, 391 U.S. 123, 139-40 (1968) (White, J. dissenting)).

Applying the *Chapman* standard to this case, we cannot conclude that the verdict in Moran's trial was "surely unattributable" to the admission of his inculpatory statements. *See Sullivan*, 508 U.S. at 279. Moran's statements were the centerpiece of the State's evidence. No physical evidence linked Moran to the crime scene, the gun, or Tony Alcantar's vehicle. The only other evidence connecting Moran to the murder is the testimony of Hilda Alcantar and Jose Garza who stated that Moran told them that he shot Tony Alcantar. Although the testimony of these witnesses corresponds with the evidence, we cannot ignore the dramatic impact that a confession,

13

written by Moran himself, must have had on the jury's determination of guilt. *See Fulminante*, 499 U.S. at 296. We hold that the error in the admission of Moran's written statements contributed to the conviction, and, therefore, we must reverse the conviction. *See* Tex. R. App. P. 44.2(a); *Chapman*, 386 U.S. at 24.

## CONCLUSION

We hold that the trial court erred by admitting Moran's written statements into evidence because those statements were the product of continued interrogation after Moran had invoked his right to counsel. We cannot conclude beyond a reasonable doubt that this error did not contribute to the conviction. Accordingly, we reverse the judgment of conviction and remand for further proceedings consistent with this opinion.

_____

Bea Ann Smith, Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear: Opinion by Justice B. A. Smith
    Dissenting Opinion by Justice Puryear

Reversed and Remanded

Filed: July 7, 2005

Publish

14