IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-1310-05






ARMANDO MORAN, Appellant


 

v.



THE STATE OF TEXAS







ON STATE'S PETITION FOR DISCRETIONARY REVIEW 


FROM THE THIRD COURT OF APPEALS

TRAVIS COUNTY





 Hervey, J., delivered the opinion of the Court in which Keller, P.J., Meyers,
Keasler, Holcomb, and Cochran, JJ., joined. Johnson, J., concurred. Price, J.,
dissented. Womack, J., not participating.


O P I N I O N


 Appellant was convicted of murder. He committed this murder in Austin and fled to Laredo. 
Appellant provided two written statements (the "statements") to the Laredo police. The Court of
Appeals decided that these statements should not have been used by the State at appellant's trial
because they were the product of custodial interrogation by the police after appellant had invoked
his right to counsel. See Moran v. State, 171 S.W.3d 382, 384 (Tex.App.-Austin 2005). We will
reverse.

 Appellant filed a motion to suppress, generally alleging that the statements were obtained in
violation of the "Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution." 
Appellant's motion to suppress did not specifically allege that the statements were the product of
custodial interrogation after he had invoked his right to counsel. The suppression-hearing record
reflects that appellant voluntarily accompanied two other persons (Hilda and Vanessa) to the Laredo
Police Department after learning that the police wanted to question them about the Austin murder. 
Appellant provided the statements to Laredo Police Detective Guzman in an interview room at the
Laredo Police Department.

 On direct examination by his attorney at the suppression hearing, appellant testified that these
statements were the result of his voluntary intoxication and Guzman's promise that "everything
would go all right" if appellant confessed (Guzman denied making any such promises and also
testified that appellant appeared to be in control of his mental faculties). Appellant made no claim
during this direct examination by his attorney that these statements were the product of custodial
interrogation after he had invoked his right to counsel. Appellant testified on direct examination by
his attorney:

 Q. [DEFENSE]: Okay. At the time that you signed the statements on the 19th of May,
2002, did you understand what you were doing about signing the statement against
your interest?


 A. [APPELLANT]: To a point.


 Q. Well, by "to a point," how do you mean?


 A. Well, I was really, I was really just writing it thinking, you know, they explained
to me that, you know, if I wrote this everything would go all right and, you know, I
was just doing it just to hurry up the process. I wasn't really thinking about the
situation itself.


 Q. Was that decision, was it because of the alcohol and drugs that you had been
taking?


 A. I was still under the influence, sir.

 

 Appellant also testified on direct examination by his attorney that he knew that he was a
suspect in the Austin murder and that he "felt" that he was being "detained" for this murder when
he made the statements even though no one had told him that he was under arrest.

 Q. [DEFENSE]: And so even though you weren't handcuffed at that time, even
though they hadn't told you you were under arrest, you felt that you were being
detained for the murder of Tony, didn't you?


 A. [APPELLANT]: Yes, sir.


 Guzman testified at the suppression hearing that appellant was not arrested until after he
made the statements.

 Q. [STATE]: Okay. In your initial interview with the defendant, did you say
anything to him to indicate that he was under arrest at that time?


 A. [GUZMAN]: No, sir.


 Q. As far as you were concerned, based upon the information that was available to
you, did you consider the defendant to be under arrest at that time?


 A. No, sir.


 Q. As far as you were concerned, had he wished to leave at that point in time, was he
free to leave?


 A. He was free to leave, but he didn't ask.


 Q. Did you do or say anything to him before you began questioning him to indicate
to him that he might not be free?


 A. No, sir.

* * *

 Q. Okay. So in between the time that you initially met [appellant] there in the
interview room and 2 a.m. when the second written statement was completed, I
presume you had learned from [Austin] Detective Fuentes that an arrest warrant had
actually been issued there in Austin for the arrest of [appellant]?


 A. That is correct.


 Q. And that arrest warrant was for the offense of murder?


 A. Correct.


 Q. Now, at any time prior to 2 a.m. when [the second written statement was
completed], did you inform [appellant] that this arrest warrant had been issued?


 A. No, I had not.


 Q. Do you know whether or not Detective Guerra or anyone else with your
department informed the defendant that an arrest warrant had been issued before 2
a.m.?


 A. No, sir.


 Q. At what point in time did you inform him, if at all, that the warrant had been
issued?


 A. It was when [Austin Detective] Fuentes told me that the arrest warrant had been
secured.


 Q. Was that after 2 a.m.?


 A. That was after 2 a.m.


 Guzman also testified that, when he initially met appellant in the police interview room and
informed appellant that he was a suspect in the Austin murder, appellant told Guzman that he wanted
to speak to an attorney. Guzman responded that appellant had that right and also told appellant that
he had already spoken to several other people. Guzman then began to leave the room. As Guzman
reached the door, appellant told Guzman that he would tell him what happened after which appellant
made the statements.

 Q. [STATE]: Now, thereafter, as I understand it, you mentioned something about
assisting the Austin Police Department homicide investigation?


 A. [GUZMAN]: That's correct. I explained to [appellant] why he was here, and I
told him that there was a murder in Austin, we were assisting the Austin Police
Department, and that he was a suspect in the murder.


 Q. All right.


 A. And I did tell him that, if he wanted to talk to us at that point.


 Q. All right. And what did you recall [appellant's] response being after you informed
him that he was a suspect in this murder?


 A. He told us that he wanted to speak to an attorney.


 Q. And at that point in time, the individuals that were physically present were
yourself, [appellant], and Martin Guerra?


 A. That's correct.


 Q. What if anything-well, strike that. Prior to [appellant] making that statement, had
you handcuffed him?


 A. No.


 Q. And what if anything did you do or say when [appellant] informed you that he
wanted to speak with an attorney?


 A. I just advised him, I told him that he had that right. I also told him that we had
already spoken to Hilda, we spoke to Jose Luis and Jerry. At that time we got up and
we were walking out of the room.


 Q. And do you recall any further conversation before you and Detective Guerra stood
up to leave the room?


 A. That was it, from our part.


 Q. Do you recall whether or not Detective Guerra said anything before the two of you
stood up to leave the room?


 A. No, we both stood up and we were walking out.


 Q. All right. As you were walking out of the room, what if anything do you recall
occurred?


 A. As we reached for the-I reached for the door, and Guerra was right behind me. 
I just opened it up. And he said, "simon," which means, yes, I will tell you, I will tell
you what happened.


 Appellant testified on cross-examination by the State that he did not remember what Guzman
told him when he told Guzman that he wanted to speak to an attorney. Appellant also testified
during this cross-examination that he was under the influence of alcohol and not thinking clearly
when he told Guzman that he wanted to speak to an attorney and that he continued to talk to Guzman
because Guzman told him that it would "make it easier" on himself (not because Guzman told
appellant that he had spoken to the other people).

 Q. [STATE]: You heard-you had an opportunity to hear Detective Guzman's
testimony earlier this afternoon about that interview, right?


 A. [APPELLANT]: (Nods affirmatively).


 Q. You will need to say yes or no for the record.


 A. Yes, sir.


 Q. Okay. Now, after Detective Guzman-strike that. Did he read you your Miranda
warnings, the right to remain silent and those other rights before he asked you
anything about these events?


 A. I really don't remember, sir.


 Q. Okay. Do you know why you don't remember?


 A. Because I was still under the influence at the time.


 Q. And at that point in time, you were under the influence of what?


 A. Alcohol.

* * *

 Q. Okay. After Detective Guzman read you your Miranda rights, do you recall
saying to him that you wanted to speak with an attorney?


 A. Yes, sir.


 Q. All right. And what did Detective Guzman, what do you recall him saying to you
at that point?


 A. I do not remember, sir.


 Q. Do you remember what, what happened after you indicated you wanted to speak
with an attorney?


 A. Well, I remember-I don't remember what was said. I just remember him starting
to walk out the door.


 Q. All right. What if anything do you remember happening when he started to walk
out the door?


 A. I believe I told him yes, I'll say something.


 Q. And why did you say that?


 A. Because I felt that, you know, I would be able to leave.


 Q. What made you think that you would be able to leave if you said something versus
not saying it?


 A. Because I wasn't thinking clearly, sir.


 Q. All right. So it wasn't anything that Detective Guzman said? It was just because
you weren't thinking clearly?


 A. Well, he said, you know, make it easier on yourself.


 Q. When did he say that?


 A. Right before he got up.


 Q. Okay. And then you said, Okay, I will talk to you?


 A. (Nods affirmatively).


 During its closing arguments to the trial court at the suppression hearing, the State claimed,
among other things, that appellant was not under arrest and in "custody" when he made the
statements. During his closing arguments to the trial court at the suppression hearing, appellant
briefly mentioned in one sentence the statements at issue in this case, and devoted the rest of his
arguments to other statements that he made to Austin detectives in the car trip from Laredo to
Austin. (1) During these closing arguments, appellant claimed only that the statements at issue in this
case "were all not knowing waivers of his rights to remain silent because of intoxication at the time
of the events." Appellant made no claim during his closing arguments to the trial court that these
statements resulted from custodial interrogation after he had invoked his right to counsel. The trial
court denied appellant's motion to suppress these statements expressly finding that they were "not
subject to suppression."

 Appellant claimed for the first time on direct appeal that the statements were the product of
custodial interrogation after he had invoked his right to counsel. (2) Without considering preservation
of error, the Court of Appeals decided that the trial court should have suppressed these statements
because Guzman's retort to appellant (after appellant had invoked his right to counsel) about having
spoken to the other people was the functional equivalent of interrogation, which Guzman should
have known was reasonably likely to elicit incriminating responses from appellant. Moran, 171
S.W.3d at 390; see Rhode Island v. Innis, 446 U.S. 291, 301 (1980) ("interrogation" is any words
or actions on the part of the police that the police should know are reasonably likely to elicit an
incriminating response); Miranda v. Arizona, 384 U.S. 436, 474 (1966) (custodial interrogation must
cease once suspect invokes right to counsel). (3) We exercised our discretionary authority to review
this decision. The ground upon which we granted review states:

 If a statement made by a law enforcement officer to a suspect after invocation of the
right to counsel does not reasonably call for an immediate response, is the officer's
statement nevertheless viewed as interrogation if the suspect nevertheless makes
incriminating admissions?

 

 The trial court's supplemental findings (4) in this case do not address the issue of whether
Guzman's reply to appellant that he had spoken to the other people was the functional equivalent of
interrogation under Rhode Island v. Innis. (5) See Moran, 171 S.W.3d at 387 (noting that it had sent
the case back to the trial court for supplemental findings). However, findings that support the trial
court's ruling will be implied. See State v. Kelly, 204 S.W.3d 808, 818-19 (Tex.Cr.App. 2006).

 The issue is whether Guzman's response to appellant about having spoken to the other people
meets Innis' definition of "interrogation." See Innis, 446 U.S. at 301 ("interrogation" is any words
or actions on the part of the police that the police should know are reasonably likely to elicit an
incriminating response). This definition of "interrogation" focuses "primarily upon the perceptions
of the suspect, rather than the intent of the police." See Innis, 446 U.S. at 301 (subjective intent of
police officer to obtain incriminating statement not relevant to determining whether an interrogation
has occurred).

 It is, therefore, significant that appellant never testified that Guzman's reply to him about
having spoken to the other people caused him to re-initiate conversation with Guzman and
incriminate himself. It is also significant that appellant testified that he re-initiated conversation with
Guzman because he thought that he would be "able to leave," and not because Guzman told him that
he had spoken to the other people. It is even more significant that the record supports a finding that
Guzman's reply to appellant's invocation of his right to counsel was so insignificant from appellant's
perspective that appellant did not even remember what Guzman said. This record supports an
implied finding that Guzman's reply to appellant could not have had any effect on appellant's
decision to re-initiate the conversation with the police. This record also supports findings that
appellant did not preserve the Rhode Island v. Innis issue in the trial court and that he was not in
custody when he made the statements. See State v. Dixon, 206 S.W.3d 587, 590 (Tex.Cr.App. 2006)
(op. on orig. subm'n) (discretionary review court may affirm trial court's ruling if it is reasonably
supported by the record and is correct on any theory of law applicable to the case).

 The judgment of the Court of Appeals is reversed, and the judgment of the trial court is
affirmed.

 Hervey, J.

 


Delivered: January 31, 2007

Publish
1. Appellant also sought suppression of these other statements he made to Austin detectives
during the car trip from Laredo to Austin. These statements are not at issue here. 
2. Appellant asserted in his brief on direct appeal:


 Appellant did not initiate further communications, exchanges or conversations with
the Laredo police. After Appellant invoked his right to counsel, Officer Fuentes [sic]
initiated further exchanges by telling Appellant he had spoken with Hilda, Jose and
Jerry. This prompted Appellant to agree to incriminate himself.
3. In reaching this decision, the Court of Appeals also noted that "the record reflects, and the
State does not dispute, that [appellant] was in police custody and invoked his right to counsel prior
to making any inculpatory statement to the police." See Moran, 171 S.W.3d at 388. The State
disputed the custody issue in the Court of Appeals in a motion for rehearing and in another motion
for rehearing en banc, which were denied without an opinion. For example, in its motion for
rehearing, the State asserted that the omission in its brief of any analysis of whether appellant was
in custody when he made the statements was not intended as a concession that appellant was in
custody. The State apologized for its "initial failure to explain to the Court [of Appeals] how the law
regarding custody applies to the present factual scenario."
4. The trial court made three findings regarding the statements at issue in this case:


 1. Before the defendant made his written statements, State's exhibits 2 and 3, he
knowingly, intelligently, and voluntarily waived all rights as set out in the warnings
and in State's exhibit 1.


 2. The written statements were made in the defendants [sic] own handwriting under
voluntary conditions with no indications of any coercion, threats, or duress placed
upon him by the officers.


 3. For much of the time, the detectives left the defendant alone in the room when
composing the statements, exhibits 2 and 3.
5. Appellant's failure to raise this claim in the trial court at the suppression hearing might
explain this.