PD-0390-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 5/8/2015 1:55:28 PM
Accepted 5/12/2015 1:02:41 PM
ABEL ACOSTA
CLERK

**NO. PD-0390-15**

**COURT OF CRIMINAL APPEALS**

*TEXAS RULES OF APPELLATE PROCEDURE*, RULE 68.4

---

**MONA YVETTE NELSON**

**v.**

**THE STATE OF TEXAS**

---

**On Petition for Discretionary Review from the First Court of Appeals in No. 01-13-00769-CR Affirming the Conviction in No. 1394964 from the 182nd Judicial District Court of Harris County, Texas**

---

**APPELLANT'S PETITION FOR DISCRETIONARY REVIEW**

---

FILED IN
COURT OF CRIMINAL APPEALS

May 12, 2015

ABEL ACOSTA, CLERK

**ALLEN C. ISBELL**
**2016 Main St., Suite 110**
**Houston, Texas 77002**
**713-236-1000**
**Fax No. 713-236-1809**
**STATE BAR NO. 10431500**
**email: allenisbell@sbcglobal.net**

**COUNSEL ON APPEAL**

**NAMES AND ADDRESSES OF ALL PARTIES
AT THE TRIAL COURT'S FINAL JUDGMENT**

Trial Judge

    Honorable Jeannine Barr
    182nd District Court
    1201 Franklin, 18th Fl., Houston, Texas 77002


Appellant/Defendant

    Ms. Mona Yvette Nelson
    #01877556
    Hobby Unit
    742 FM 712, Marlin, Texas 76661


Appellant's Counsel

    Mr. Allen C. Isbell - Counsel on Appeal
    202 Travis, Suite 208, Houston, Texas 77002

    Mr. Allen Tanner - Counsel Attorney at Trial
    917 Franklin St., Suite 550, Houston, Texas 77002


Attorneys for the State of Texas

    Ms. Constance "Connie" Spence - Assistant District Attorney at Trial
    1201 Franklin, 6th Fl., Houston, Texas 77002

    Ms. Anshu "Sunni" Mitchell - Assistant District Attorney at Trial
    1201 Franklin, 6th Fl., Houston, Texas 77002

# TABLE OF CONTENTS

**PAGE**

Names and Addresses of All Parties at the Trial Court's Final Judgment
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Index of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Statement Regarding Oral Argument . . . . . . . . . . . . . . . . . . . . . . . iv

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Ground for Review 1**
**Whether the Court of Appeals conducted an adequate analysis of the "totality of the circumstances" in deciding that the police officers did not use impermissible interrogation techniques that caused appellant to incriminate herself after she had terminated the police interview and requested counsel?** . . . . . . . . . . . . . . 1-2

**Ground for Review 2**
**Whether the Court of Appeals' decision tacitly approving the technique of police officers describing the gruesome details of a child's murder while the suspect is forced to be in their presence is consistent with appellant's right to terminate the interrogation and asking for counsel?** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Brief Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Conclusion and Prayer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

# INDEX OF AUTHORITIES

**STATUTES**                                                    **PAGE**

*Texas Rules of Appellate Procedure*, Rule 66.3(b)(c)  . . . . . . . . . . . . . . . . 7

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is waived.

**TO THE HONORABLE COURT OF CRIMINAL APPEALS:**

COMES NOW MONA YVETTE NELSON, appellant in the above entitled and numbered cause, by and through her appointed counsel, ALLEN C. ISBELL, and petitions the Court of Criminal Appeals to review the opinion by the First Court of Appeals, and respectfully shows this Court the following in support of her petition.

## Statement of the Case

This appeal is from a conviction for Capital Murder arising out of the 182nd District Court of Harris County, Texas, the Honorable Jeannine Barr, Judge Presiding. Appellant waived her right to a trial by jury and entered a plea of "not guilty." The judge found appellant guilty. The judge assessed punishment at LIFE in the Institutional Division of the Texas Department of Criminal Justice.

## Statement of Procedural History

The First Court of Appeals handed down an opinion affirming the conviction on March 10, 2015. Appellant filed a Motion for Extension of Time to file the petition. This petition is filed within the time allowed by law.

## Ground for Review 1

**Whether the Court of Appeals conducted an adequate analysis of the**

**"totality of the circumstances"** in deciding that the police officers did not use impermissible interrogation techniques that caused appellant to incriminate herself after she had terminated the police interview and requested counsel?

## Ground for Review 2

**Whether the Court of Appeals' decision tacitly approving the technique of police officers describing the gruesome details of a child's murder while the suspect is forced to be in their presence is consistent with appellant's right to terminate the interrogation and asking for counsel?**

## Brief Argument

An appellate court must consider the "totality of the circumstances" when deciding whether an accused's constitutional rights have been preserved. In deciding whether the police officers used impermissible interrogation techniques to cause Appellant to renew talking to the police, after she had terminated the interrogation and requested counsel, the Court of Appeals opinion does not review adequately the "totality of the circumstances." The opinion does not consider or mention indisputable facts that are a significant part of the "totality of the circumstances," such as:

First, after appellant told Investigator Phil Waters that she did not want to talk to the police any more and that she wanted counsel, Waters made her sit in the room with him and listen to what Waters wanted to say to her about this horrendous homicide. This action by Waters sheds light on what Waters and Sgt. Harris did shortly later during the ride to the jail when appellant was forced to be in the back seat. But, the Court of Appeals did not mention or consider this event as part of the "totality of the circumstances." This is what occurs between Waters and appellant immediately after she says that she does not want to talk any more, that she wants to talk to a lawyer:

Mona Nelson: I don't want to talk any more. I want to talk to a lawyer.

Partner (Waters): Okay. Well then you can listen to me. How about that? I'll talk. I don't need a lawyer, but I can talk. All right?

Mona Nelson: [sighs]

Partner: Here's what's happened. Here's what's disappointing to me. You and I have sat in here, and I thought we had kind of a relationship when we walked out of this place.

Mona Nelson: I did also.

Partner: All right. And what you told me was that you would talk to me again today, and we would discuss the fact that your – that you and your truck are in that video, with that little boy . . .

| Mona Nelson: | That y'all are saying my truck is at . . . |
|---|---|
| Partner: | No, no, no, no. Listen. |
| Mona Nelson: | I would like to talk to a lawyer. I don't want to talk any more. |
| Partner: | Okay. Well, I – you don't have to talk. |
| Mona Nelson: | But you're asking me questions and you're talking to me. |
| Partner: | No, no, no. I haven't asked you a question. |
| Mona Nelson: | Ohh. |
| Partner: | I want you to sit and listen to me. All right? (State's Exhibit 341, pp. 110-111). |

The significance is that this is the technique of interrogation used shortly later when Investigator Phil Waters and Sgt. Harris have appellant in the back seat of their patrol car, taking her to jail.

Second, in analyzing the "totality of the circumstances," the opinion does not include Investigator Phil Waters admissions under oath that Sgt. Harris may have said something during the ride in the police car "about the sad life he (the victim) had that his mom and his dad didn't care about him, and that it was sad he died the way he did." Waters' admission that during the ride to the jail, he and Harris discussed about how horrible the victim's death was, his charred remains, the manner of his death and what suffering the child went

through before he died. Waters' testimony showed that his and Sgt. Harris' "interrogation technique" succeeded. Waters said that when they arrived at the jail, appellant appeared emotional and had a tear running down her face. Waters testified that when they arrived at the jail, appellant said that she was not a monster. After the ride to the jail, appellant confessed (R.R. 5, 205-206).

Third, that Sgt. Harris wrote the offense report section about the ride to the jail. It was written contemporaneously with the event. Sgt. Harris wrote in his offense report that "the car ride was very quiet, and Walters and I were talking back and forth on how strange the case was and how horrific it had been for Jonathan." The Court of Appeals' opinion quotes what Sgt. Harris said about the ride to the jail during the pre-trial motion to suppress appellant's statements which she made after that ride. The opinion notes that Sgt. Harris said that during the ride he turned the "good time radio" on and that he "turned it up" so what he and Waters discussed could not be overheard by appellant who was sitting in the back seat. Harris claimed that the conversation between himself and Waters was about how the case was managed, the dynamic of the case itself as far as the assignments and some decisions that Lieutenants had made" with which they did not agree (R.R. 4,

138-139).  The opinion leaves the impression that appellant could not hear the conversation between Waters and Harris.   However, the "totality of the circumstances" review shows that is not true.

Third, in reviewing the "totality of the circumstances," the Court of Appeals does not mention that Sgt. Harris admitted that he described the horrific nature of this crime, showing her a picture of the victim's charred remains, because he  was trying to appeal to appellant to confess because appellant had mentioned that she was religious, that she was a Christian.  The opinion does not mention that Investigator Phil Waters seized upon appellant's religious sentiment as a Christian in mentioning the story of Cain and Abel (R.R. 4, 172-174).

Appellant exercised her Constitutional rights to terminate being interrogated by the police officers, and her right for counsel to act as a medium between her and the State.  The State had an affirmative duty not to act in a manner that circumvents those Constitutional protections.  She was entitled to be free of being interrogated without counsel, regardless of the form of that interrogation.

 By not doing an adequate analysis of the "totality of the circumstances," the Court of Appeals' opinion tacitly approves the interrogation tactic of forcing

an accused to sit and listen to the police harangue the accused by describing gruesome, horrendous facts of a murder, after the accused has terminated the interrogation and has asked for counsel.

The Court of Appeals has decided an important question of law that the Court of Criminal Appeals should address. The Court of Appeals' conflicts with established Constitutional Law. *Texas Rules of Appellate Procedure*, Rule 66.3(b)(c).

## Conclusion and Prayer

Appellant prays that this Court grant her Petition for Discretionary Review. Following the grant of review, Appellant prays that this Court reverse the judgment of the Court of Appeals.

Respectfully submitted,

/s/ Allen C. Isbell
ALLEN C. ISBELL
2016 Main St., Suite 110
Houston, Texas 77002
713/236-1000
Fax: 713/236-1809
STATE BAR NO. 10431500
email: allenisbell@sbcglobal.net

COUNSEL ON APPEAL

**Certificate of Service**

I hereby certify that on this 8th day of May, 2015, a true and correct copy of the forgoing petition has been sent to the District Attorney's Office, Appellate Division, and to Ms. Mona Yvette Nelson, appellant.

/s/ Allen C. Isbell
ALLEN C. ISBELL

**Certificate of Compliance**

The undersigned attorney on appeal certifies this petition is computer generated and consists of 1,838 words. Counsel is relying on the word count provided by the Word Perfect computer software used to prepare the petition.

/s/ Allen C. Isbell
ALLEN C. ISBELL

**Opinion issued March 10, 2015**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-13-00769-CR

_____

**MONA YVETTE NELSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 182nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1394964**

---

## O P I N I O N

Appellant Mona Yvette Nelson was charged with the offense of capital murder. TEX. PENAL CODE § 19.03. After a plea of "not guilty," the case was tried to the court, which found Nelson guilty and sentenced her to life in prison. On appeal, Nelson contends that the trial court abused its discretion when it admitted

into evidence her statements made to the police after she had asked to speak to a lawyer. Applying the standard of *Rhode Island v. Innis*, 446 U.S. 291, 100 S. Ct. 1682 (1980), we conclude that the record supports the trial court's factual determination that Nelson's statements were not the result of further interrogation without her lawyer present. Accordingly, we affirm.

## Background

The complainant, a 12-year-old boy named Jonathan, went missing on the afternoon of Christmas Eve 2010. The police were called that evening, and a missing-person report was filed on Christmas day. Jonathan's dead body was found three days later, in a drainage pipe across the street from a warehouse. The boy's wrists were tied behind his back, and his body was so badly burned that a visual identification was impossible.

The police reviewed surveillance video obtained from the warehouse. Footage from Christmas Eve showed that at 6:06 p.m. a gray truck with distinctive wheels stopped near where the body was found. A person wearing a white shirt and a white baseball cap was shown walking outside of the truck, appearing to move items in the bed of the truck. As cars passed by, the person ducked down behind the truck.

When officers were told to be on lookout for the truck in the surveillance video, two officers investigating Jonathan's disappearance were driving up to the

2

home of appellant Mona Nelson. The officers noticed that her truck, with its distinctive wheels, matched the description. Nelson consented to a search of her truck, and then she voluntarily accompanied the officers to police headquarters for an interview. This interview was the first in a series of interviews she gave to the police over the course of two days.

Nelson gave a videorecorded statement during her first interview. She was acquainted with Jonathan, and she admitted seeing him on Christmas Eve. Nelson denied having anything to do with Jonathan's disappearance, and she stated that no one else used her truck that day. Following that statement, she gave the police permission to search her home. She also agreed to participate in a live lineup.

Later that evening, Sergeant B. Harris, one of the lead investigators, asked Nelson if she would speak with him. She agreed, and they began a second recorded interview at 1:26 a.m. Sgt. Harris informed Nelson that a witness placed her at Jonathan's last known location around the time he disappeared. She was also shown the surveillance video that showed a truck similar to hers at the site where Jonathan's body was found. Nelson denied that the truck was hers. After about an hour, Nelson terminated the interview, so Sgt. Harris returned her to her home. The two agreed to speak again later that day.

By 8:25 a.m., the police had secured a warrant for Nelson's arrest. Sgt. Harris and the other lead investigator, Officer P. Waters, met Nelson at her

house and asked if she would speak with them again. Nelson agreed to a third interview. Sgt. Harris told her that she was free to go and not under arrest at the time. During the interview at police headquarters, Nelson began coughing and spitting up blood. When she asked to stop the interview so she could go to see a doctor, she was placed under arrest. Nelson then invoked her right to a lawyer, stating, "I want a lawyer. I don't want to talk anymore." The investigating officers took Nelson to a police station to be booked into jail.

During the drive to the jail, Sgt. Harris and Officer Waters turned up their AM/FM car radio to have a conversation without Nelson hearing. The record is essentially undisputed that the investigators' conversation discussed the "horrific" circumstances under which Jonathan was "burned alive" and "burned to a crisp." Upon reaching the police station, Nelson had become emotional. She cooperated with routine booking questions and stated that she was "not a monster." Sgt. Harris responded, "Well, we don't . . . know anything other than what we've got to go with." Nelson told him to keep investigating, and he responded that he couldn't have a conversation with her because she had "lawyered up." Nelson replied, "You had told me earlier that if I reached out to you . . . we could talk. So, I'm reaching out."

The investigating officers then took Nelson back to the headquarters for a fourth recorded interview, stopping along the way at a hospital so she could

4

receive treatment. At the headquarters, she waived her right to counsel and dictated a written custodial statement, which was also recorded. Nelson later moved before trial to suppress the evidence of her inculpatory statements in the fourth recorded interview, on the grounds that they were improperly elicited after she had invoked her right to counsel. The trial court denied the motion to suppress, and Nelson ultimately was convicted of capital murder and sentenced to life in prison.

**Analysis**

On appeal, Nelson argues in a single issue that the admission of her statements in the fourth interview violated her rights under the Fifth and Fourteenth Amendments to the United States Constitution.

In reviewing the trial court's ruling on a motion to suppress statements made as a result of custodial interrogation, we apply a bifurcated standard of review. *Pecina v. State*, 361 S.W.3d 68, 78–79 (Tex. Crim. App. 2012) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). We review the ruling in light of the totality of the circumstances, giving total deference to the trial court on questions of historical fact, as well as its application of law to fact questions that turn on credibility and demeanor. *Id*. at 79; *Leza v. State*, 351 S.W.3d 344, 349 (Tex. Crim. App. 2011). But we review de novo the trial court's rulings on questions of law and mixed questions of law and fact that do not depend on credibility determinations. *Pecina*, 361 S.W.3d at 79; *Leza*, 351 S.W.3d at 349. We

5

view the record in the light most favorable to the trial court's ruling and reverse the judgment only if it is outside the zone of reasonable disagreement. *Hereford v. State*, 339 S.W.3d 111, 118 (Tex. Crim. App. 2011). When the trial court makes no express, written findings of fact following its ruling on a motion to suppress, we must presume that the trial court found facts consistent with its ruling as long as the implied findings are supported by the record. *Id.*

To protect the privilege against self-incrimination guaranteed by the Fifth Amendment, police may not conduct a custodial interrogation of a suspect who has requested the assistance of counsel. *Minnick v. Mississippi*, 498 U.S. 146, 147, 111 S. Ct. 486, 488 (1990); *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S. Ct. 1880, 1884–85 (1981). Once an individual in custody invokes her right to counsel, "interrogation 'must cease until an attorney is present.'" *Minnick*, 498 U.S. at 150, 111 S. Ct. at 489 (quoting *Miranda v. Arizona*, 384 U.S. 436, 474, 86 S. Ct. 1602, 1628 (1966)). Thus statements made in response to further police-initiated questioning without the presence of an attorney are inadmissible, even if made after the suspect is again advised of her rights. *Id.* at 150–51, 111 S. Ct. at 489.

Before a subject in custody can be subjected to further interrogation after she requests an attorney, there must be a showing that the suspect herself initiated dialogue with the authorities. *Edwards*, 451 U.S. at 484–85, 101 S. Ct. at 1885. Once a suspect has invoked her right to counsel, her unwillingness to communicate

6

with authorities without the presence of counsel "is presumed to persist" unless the suspect herself "initiates further conversation about the investigation." *Cross v. State*, 144 S.W.3d 521, 526 (Tex. Crim. App. 2004). To establish that a suspect has waived her previously-invoked right to counsel, the State must prove two things: that the suspect herself initiated further communication with the authorities; and that she thereafter validly waived her right to counsel. *Id.* at 526–27. A valid waiver of the right to counsel cannot be established by "showing only that [the accused] responded to further police-initiated custodial interrogation, even if [she] has been advised of [her] rights." *Edwards*, 451 U.S. at 484, 101 S. Ct. at 1884–85.

In this context, the term "interrogation" refers "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 1689–90 (1980); *Moran v. State*, 213 S.W.3d 917, 922–23 (Tex. Crim. App. 2007). The determination of whether the police should know such actions are reasonably likely to elicit an incriminating response "focuses primarily on the perceptions of the suspect, rather than the intent of the police." *Innis*, 446 U.S. at 301, 100 S. Ct. at 1690. Furthermore, "[a]ny knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an

important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect." *Id*. at 301 n. 8, 100 S. Ct. at 1690 n.8. Off-hand remarks that are not particularly evocative under the circumstances do not constitute interrogation, as opposed to subjecting the suspect to a "lengthy harangue." *Id*. at 303, 100 S. Ct. at 1691.

In this case, the trial court determined, and the parties agree, that Nelson invoked her right to counsel during the third interview. The trial court also determined that Nelson was in custody after the third interview. The disputed question on appeal is whether the police officers used impermissible interrogation techniques to prompt Nelson's renewed communications, which led to the fourth interview.

At the hearing on the motion to suppress, the trial court heard testimony regarding the actions of the police between Nelson's initial invocation of her right to counsel and her later reinitiation of communication with the police. Sgt. Harris testified that in their car on the way to book Nelson into jail, he and Officer Waters had a conversation in the front seat. Nelson was in the back seat, and the officers turned on their car radio. Sgt. Harris testified that he and Officer Waters spoke in a low voice so that Nelson would not be able to hear. He stated that they discussed the management and dynamics of the case, as well as "the fact of this little boy

who had been found the way he had been found" and "how horrific the case was." He admitted that he may have said something like Jonathan "was burned to a crisp and how terrible it must have felt to be burned alive." He stated that he never looked back at Nelson during the ride. Once they arrived at the substation, he noticed that Nelson's demeanor had changed and that she "had a tear, some sniffles." Officer Waters generally corroborated Sgt. Harris's account. He testified that Sgt. Harris "may have made a comment . . . about the way [Jonathan] died." Further, he said that Nelson appeared to be emotional when they arrived at the substation.

Nelson testified to a different version of events. She testified that the radio was never on and that Sgt. Harris looked at her in the rearview mirror while discussing how someone with kids would want to help with Jonathan's case. She said that she heard the officers speaking of how "poor Jonathan's body was burnt," and "how sad it was that he had to go that way." She further stated that they remarked, "[Y]ou would think somebody with kids would want to help and give as much information as possible." Nelson also testified about her discussion with Sgt. Harris once they had arrived at the police station:

Q: And after you had tears in your eyes after hearing them talk, did you say anything to them?

A: No, sir, not until we got to the jail, he opened the door and saw that I was upset. And he said, "Look, it's clear that you—you know, you have kids. And if you reach out to us, if there's

anything you can tell us, you know, wouldn't you want to know? Wouldn't you want to know what happened? And if you had any information, I mean, wouldn't you want to know? And if you—if you reach out to us, we can—we can help you, you know, if you help us. I mean, we can—we can get you proper medical treatment. You don't have to go in there and, you know, be treated—you know, how they treat prisoners in there."

The trial court denied Nelson's motion to suppress her statements in the fourth interview and explained its findings from the bench. The court noted that it was "crucial" to its findings that it believed Nelson to be "educated" and "intelligent." As such, the court did not believe "that the comments did elicit her reinitiating the conversation." The court further found that the investigators' conversation was "not intended to get her to start talking," since the officers "had been talking to her many, many times before and none of the other methodologies seemed to get her to really talk or say too much." In conclusion, the court found "the defendant did reinitiate conversation," that in the fourth interview Nelson "was once again given all of her warnings," and that "she did waive all of those rights and voluntarily agree to give a statement."

The question of whether the officers violated the prohibition on interrogation in this case, after Nelson asserted her right to counsel, is similar to the circumstances of *Rhode Island v. Innis*, 446 U.S. 291, 100 S. Ct. 1682 (1980). In that case, the defendant was accused of murdering a taxi driver. *Innis*, 446 U.S. at 293, 100 S. Ct. at 1686. The murder weapon was believed to be a sawed-off

10

shotgun, although the defendant was unarmed when he was found by the police. *Id*. at 294, 100 S. Ct. at 1686. After the defendant was arrested and advised of his *Miranda* rights, he requested a lawyer. *Id*. He was placed in a vehicle with three officers to be driven to the police station. *Id*.

As they drove to the station, two officers discussed the missing shotgun, which they believed to be in an area near a school. *Id*. at 294–95, 100 S. Ct. at 1686–87. One of the officers remarked that, because a school for disabled children was nearby, there were a lot of those children running around, and "God forbid one of them might find a weapon with shells and they might hurt themselves." *Id*. The defendant then interrupted the officers, asking them to turn the car around so he could show them where the gun was located. *Id*. at 295, 100 S. Ct. at 1687.

The Supreme Court considered whether the actions of the police amounted to the "functional equivalent" of express questioning, such that they would have violated *Miranda*'s safeguards against custodial interrogation without a lawyer present. *Id*. at 298, 100 S. Ct. at 1688. After explaining that "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect" would constitute the functional equivalent of express questioning, the Court determined that the officer's remarks did not rise to the level of interrogation. *Id*. at 301–03, 100 S. Ct. at 1689–91.

11

To support its conclusion, the Court observed that nothing in the record suggested that the defendant was "particularly susceptible to an appeal to his conscience" concerning the safety of disabled children. *Id*. at 302, 100 S. Ct. at 1690. The Court further observed that nothing in the record suggested that the police knew that the defendant was "unusually disoriented or upset at the time of his arrest," noting that nothing suggested that the officers' remarks were designed to elicit a response. *Id*. at 302–03 & n.9, 100 S. Ct. at 1690 & n.9. Furthermore, the Court evaluated the officers' remarks "in the context of a brief conversation," observing that the entire dialogue "consisted of no more than a few off hand remarks," as opposed to a "lengthy harangue in the presence of the suspect." *Id*. at 303, 100 S. Ct. at 1691. The Court conceded that the conversation provided "subtle compulsion," but it held that subtle compulsion, standing alone, does not establish that the officers should have known that their words or actions were reasonably likely to elicit an incriminating response. *Id*. at 303, 100 S. Ct. at 1691.

Justice Marshall dissented, joined by Justice Brennan. *Id*. at 305, 100 S. Ct. at 1692. The dissent agreed with the Court's definition of interrogation, but not its application of that definition to the officers' conversation. It reasoned that the comments would have constituted interrogation had they been directed at the defendant, and "the result should not be different because they were nominally addressed" to another officer. *Id*. at 306, 100 S. Ct. at 1692. Notably, the dissent

pointed out that "an appeal to a suspect to confess for the sake of others, to 'display some evidence of decency and honor,' is a classic interrogation technique." *Id.*

Applying the *Innis* standard, and viewing the record in the light most favorable to the trial court's ruling, we conclude that the trial court did not commit reversible error by determining that the officers could not be imputed with knowledge that their actions were reasonably likely to elicit an incriminating response. In this regard, we must defer to the trial court's application of law to facts that turn on credibility. *Pecina*, 361 S.W.3d at 79.

As in *Innis*, in which the Supreme Court concluded the officers' remarks were not designed to elicit a response, we likewise conclude that the record supports a conclusion that the conversation conceded by the officers amounted to no more than "subtle compulsion" that did not rise to the level of interrogation. *See Innis*, 446 U.S. at 303, 100 S. Ct. at 1690. The record supports the implied factual conclusion that the officers turned up the radio in the car specifically to prevent Nelson from hearing their conversation. Furthermore, after observing the testimony the trial court found that Nelson was "educated" and "intelligent," expressly stating that she was not actually affected by the officers' discussion, and also implying a finding that she was not unusually susceptible to any particular form of persuasion inherent in the officers' comments. *See id.* at 302 n.8, 100 S. Ct. at 1690 n.8. Nelson does not dispute or challenge the trial court's assessment of her as

13

"educated" and "intelligent." The officers' remarks were brief, off-hand comments; like *Innis*, this is "not a case where the police carried on a lengthy harangue in the presence of the suspect." *See id.* at 303, 100 S. Ct. at 1691.

The essence of Nelson's argument is that the experienced police investigators involved in this case used an interrogation technique to deliberately elicit her self-incriminating statements. But the trial court found that did not happen in this case. To the extent Nelson's argument nevertheless characterizes the officers' statements as an interrogation technique, the argument is indistinguishable from the observations made in Justice Marshall's *Innis* dissent— and rejected by the *Innis* majority.

Nelson also attempts to analogize this case to the actions of officers in the noted "Christian burial speech" at issue in *Brewer v. Williams*, 430 U.S. 387, 97 S. Ct. 1232 (1977). In *Brewer*, a police officer addressed the respondent, who was a deeply religious former mental-health patient, while driving him to jail. *Id.* at 390– 393, 97 S. Ct. at 1235–36. The officer stated that the parents of a missing girl should be entitled to a "Christian burial for the little girl who was snatched away from them on Christmas (E)ve and murdered." *Id.* at 392–93, 97 S. Ct. at 1236. Williams then directed the officers to the body. *Id.* at 393, 97 S. Ct. at 1236. The Supreme Court held that the officer's speech, despite not involving any questions directed at the respondent, resulted in a Sixth Amendment violation. *Id.* at 397–98,

14

97 S. Ct. at 1239. The Court determined that the officer had "deliberately and designedly set out to elicit information from [the defendant] just as surely as and perhaps more effectively than if he had formally interrogated him." *Id*. at 399, 97 S. Ct. at 1240.

Nelson's analogy to *Brewer* is unavailing. To the extent that the Court's analysis in *Brewer* extends to the determination of whether police conduct constitutes interrogation under the Fifth Amendment, that case involved a mental-health patient, whom the police officer knew was deeply religious. *Id*. at 390–93. Indeed, the police officer in *Brewer* testified that he was attempting to extract information from the defendant when he made the Christian burial speech. *Id*. at 399. And, unlike the facts before us, the officer's remarks in *Brewer* were both lengthy and directed at the defendant. *Compare id.* at 392–93, 97 S. Ct. at 1236, *with Moreno v. State*, No. 01-85-00551-CR, 1987 WL 6130, at *3 (Tex. App.—Houston [1st Dist.] Feb. 5, 1987, pet. ref'd) (mem. op., not designated for publication) (relying on *Innis*, holding that officer's remark to appellant, "you need to find God again if you knew him at one time," was not akin to statements in *Brewer* because it was only an "off-hand remark").

In sum, viewed in the light most favorable to the trial court's ruling, the record supports the conclusion that the officers, while discussing the case with each other in hushed voices and with the radio turned up to ensure they could not

be heard, should not be charged with knowledge that their discussion was reasonably likely to elicit an incriminating response. *See Innis*, 446 U.S. at 301, 100 S. Ct. at 1689–90. As such, their actions did not constitute interrogation within the meaning of *Miranda*, Nelson's waiver of her right to counsel was valid, and her Fifth Amendment right to counsel was not violated. *See Edwards*, 451 U.S. at 484–85, 101 S. Ct. at 1884–85.

We affirm the trial court's denial of Nelson's motion to suppress her fourth interview.

## Conclusion

We affirm the trial court's judgment.


Michael Massengale
Justice

Panel consists of Justices Massengale, Brown, and Huddle.

Publish. TEX. R. APP. P. 47.2(b).