COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

JOSE ESPARZA, §

  Appellant, §

v. §

THE STATE OF TEXAS, §

  Appellee. §

§

No. 08-08-00304-CR

Appeal from the

384th District Court

of El Paso County, Texas

(TC# 20060D05258)

## **O P I N I O N**

Jose Esparza, Appellant, appeals his conviction for capital murder and attempted murder, asserting that he was denied his Fifth Amendment and Sixth Amendment right to counsel and that his confession was involuntarily made due to coercion. For these reasons, Appellant complains that the trial court improperly admitted his custodial statement into evidence at trial. We affirm.

## **BACKGROUND**

In a two-count indictment, Appellant was charged with capital murder (Count I) and attempted capital murder (Count II). After pleading not guilty, a jury found Appellant guilty of capital murder (Count I) and attempted murder (Count II), a lesser-included offense. The trial court sentenced Appellant to an automatic life sentence for his capital murder conviction as the State did not seek the death penalty. TEX. PENAL CODE ANN. § 12.31(a)(2) (Vernon Supp. 2009). For his attempted-murder conviction, the trial court sentenced Appellant to twenty years' confinement. TEX. PENAL CODE ANN. § 12.32(a) (Vernon Supp. 2009).

Before the commencement of trial, Appellant filed a motion to suppress evidence, including his video-recorded oral statement to police, and asserted that the statement was obtained as the result

of an illegal detention, arrest, and search of Appellant in violation of his constitutional rights and articles 1.06 and 38.23 of the Texas Code of Criminal Procedure.

The trial court heard and considered the following evidence in two pretrial hearings, a final oral argument, and at trial as Appellant sought to suppress the video recording in which Appellant made his custodial confession.

On Friday evening, August 25, 2006, Ruben Munoz and Maria Porras went to an El Paso nightclub to celebrate a friend's birthday, and they later left the nightclub at approximately 2 a.m. on Saturday, August 26, 2006, in a white van. Munoz stopped at a convenience store to use the restroom but it was not in working order. As his residence was nearby, Munoz pulled into the alleyway behind his home and exited the vehicle while Porras waited in the front passenger seat of the van. The last thing Munoz remembered of that evening was using the restroom in the alleyway.

At about 8:20 a.m. that same morning, Munoz was found badly beaten, but alive. However, Maria Porras and the white van were missing. Detective Jesus Pantoja, Jr. and other El Paso Police Department officers began interviewing Munoz's family members and his nightclub companions. The van was later found in a nearby alleyway and was processed for blood and fingerprints. Several of the fingerprints from the van and another found on a lug wrench discovered inside the van matched Appellant's known prints, and Detective Pantoja was notified of the fingerprint match at approximately 11 p.m. that evening.

Several hours later, at approximately 2 a.m. on Sunday, August 27, 2006, El Paso Police officers approached Appellant's residence to execute a warrant for his arrest for the aggravated robbery of Munoz. While other officers were approaching the front door of the residence, another officer observed the mostly nude and deceased body of Maria Porras in Appellant's backyard. Appellant was arrested and, except for the two youngest children, everyone in the home, including

Appellant's wife, Patricia, and members of her family, were transported to the police station in police vehicles while officers secured the residence for further investigation.

At approximately 2:35 a.m., Detectives Pantoja and Yvette Nevarez, took Appellant to an interview room at the police station and asked Appellant to read aloud a *Miranda* warning card. Appellant complied and when asked by Detective Pantoja if he understood his rights, Appellant stated that he did, and then signed the card, marking it with the date and time. According to both Detective Pantoja and Detective Nevarez, Appellant did not invoke any of his rights, never asked for an attorney, and spoke with the detectives for approximately one and one-half hours, until close to 4 a.m. During this first interview, Appellant denied being involved in the crimes.

At the end of the first interview, the detectives left Appellant in the interview room but cuffed Appellant's left hand to the chair while they proceeded to do follow-up work and awaited the results of an ongoing interview between another detective and Appellant's wife, Patricia. At some point, Detective Pantoja informed Appellant that officers were speaking with Patricia. Detective Pantoja periodically checked on Appellant during this time and during one of those checks, at approximately 4:40 a.m., Appellant asked to speak with Patricia and stated he would thereafter tell Detective Pantoja what had happened. Detective Pantoja informed Patricia that Appellant wished to speak with her, and she agreed to meet with him. Detective Pantoja stated that he moved Appellant to another interview room and then escorted Patricia to the room but never gave her any instructions. Police monitored and made a video recording of the 23 minute discussion between Appellant and Patricia, but never told either of them that a recording would be made. The recording is devoid of any statement or indication by Patricia that she was ever asked by any law enforcement officer to have Appellant give a statement explaining what happened or how Appellant may have been involved in the offenses.

At the conclusion of Appellant's conversation with Patricia, and while the video recording was continuing, Detectives Pantoja and Nevarez escorted Patricia from the room, and a few minutes later, at approximately 8:13 a.m., commenced a second interview with Appellant. Appellant again read his rights aloud from the *Miranda* warning card he had signed earlier and informed Detective Pantoja that he understood his rights. Over the course of the next 40 minutes, Appellant answered the detectives' questions and described the manner in which he had encountered and attacked Munoz and Porras. Appellant never asked for an attorney and never asked that the interview cease. At 8:53 a.m., as the second interview concluded, Appellant asked to see Patricia and the detectives brought her in to see Appellant.

Along with that of other witnesses, the trial court also heard and considered testimony from Patricia, her brother, and Appellant. During the first suppression hearing, Patricia testified that Detective Pantoja told her that Appellant did not want to tell them what had happened and had asked her "to see if [Appellant] would be able to give [her] any information since [she is] his wife." She testified that she spoke with Appellant because she understood that she was not otherwise going to "get [her] home back," where her parents, younger sister and brother, and brother-in-law lived. On cross-examination, Patricia stated that she was left with the impression that she would not get the home back because Appellant had not cooperated in providing any information about what had happened and, since her family had been removed from the home, it seemed that they would not be able to return home if Appellant did not say anything. Patricia testified that she knew that a body had been found in the backyard of the home, that it had been there for over 24 hours, and that the police were investigating that crime. She also admitted that Detective Pantoja never told her, "If you don't go in there and talk with him your family will not get its home back." Rather, she agreed, this concept was just something that was "in [her] mind."

When the suppression hearing continued on May 14, Patricia recanted this testimony and again stated, "Well, [Detective Pantoja] told me if Jose Esparza did not say anything we were not going to be able to get our home." She reiterated that Detective Pantoja wanted her to speak with Appellant to see if he would say something to her since she was his wife but he did not tell her what it was he wanted Appellant to say, only that he wanted Appellant to say what had happened. When she was transported from the police station by a police officer at approximately 10 a.m, she was taken to her uncle's house.

Patricia's brother, George Lomeli, Jr., who had also been removed from the residence after Appellant's arrest, testified that he was at the police station for approximately five hours and that an officer told him that they would need to go somewhere else for the moment until all of the evidence was collected, and they would be permitted to return home thereafter. He explained that many of the family members were transported from the police station at approximately 7:30 a.m. that same day by police who took them to an uncle's home. He testified that Patricia arrived there at approximately 10:30 a.m., and that they were able to return to their residence the next day at 8:30 p.m.

According to Appellant, he had informed the detectives during his first interview that he wished to speak with his attorney after receiving his warnings but never saw an attorney that day. At approximately 10 a.m., Appellant was taken to a jail magistrate who again advised him of his rights. However, Appellant did not tell the judge he wanted an attorney and he could not remember if the judge said he would appoint an attorney. Appellant testified that he never asked to speak to his wife and said that he confessed to the detectives because he felt pressured and motivated by his wife's emotional state, feeling that he did not have any other option.

The trial court directed Appellant's and the State's attorneys to prepare legal briefs on these

matters, and heard oral arguments before trial. During the pretrial hearings, in his legal brief, and at oral argument, Appellant asserted that after his initial interview with the detectives ended, he was left alone for several hours and that his wife, Patricia, was then improperly used as an agent of the police to aid in securing Appellant's confession during his second interview. In essence, he claimed that his statement was coerced and was involuntary.

At the conclusion of oral arguments, the trial court noted that it had reviewed the tape recordings and commented that he had problems with the conduct of Detective Pantoja:

> It was shady, to say the least. You know, and to say that the ends justify the means is a problem for me, because I cannot understand how they could in good faith, in good conscience – okay, they want to solve the situation that's in front of them. They have fingerprints, they have a good idea who the perpetrator is in their minds, but to sit there and to use a wife to get him to – to go into the room and communicate and speak with this man and be recording that, that's very troublesome to me, to say the least.
>
> And I don't know if it's going to be troubling for the Courts of Appeals or the Texas Court of Criminal Appeals or the United States Supreme Court. But for at least this trial Court, in dealing with the human factor and the issues in front of me and the people that have testified – and I'm not dealing with the dry record that's produced for the courts of appeals, I'm dealing with the situation that's in front of me. I find the conduct of Pantoja to be reprehensible, to say the least.
>
> Now, whether – still, despite that, falls within the parameters of being acceptable is another issue, okay?

The prosecutor then noted, "[The Appellant] is the one that requested the conversation with his wife. I do not believe she was an agent of the police department –." The trial court replied:

> I'm not accepting that argument.
>
> .  .  .
>
> That argument – that one's – that one I'm not – I'm dealing more specifically with the spousal communication.
>
> I'm going to tell you this right now – and we don't need to go any further on this, all right? So you might as well listen to my ruling.

. . .

My ruling is the communication between the wife and husband is not coming in this court. It's not going to be in the trial.

Appellant's counsel argued:

As soon as his wife walks out the door- Pantoja has the benefit of sitting there on the video monitor watching what's going on, and then she softened him up, and as soon as she's walking out the door this way, Pantoja is going in this door that way, and "boom" [h]ere's your rights. Tell us again exactly what you just told your wife.

That's exactly what happened here. He got him softened up. He hung tough and demanded a lawyer until they bring the wife, who he has children with, who he sleeps with, in there to soften him up, and then he spills the beans.

The prosecutor sought clarification from the court regarding the ruling regarding Appellant's statement to his wife, saying, "[B]ut you're not saying that it was against the law, but you are saying the Court is making a ruling that [it] [is] not allowing that in –."

The court replied:

I'm saying that was a spousal communication.

. . .

A privileged communication is what I'm saying.

Now the issue for the defense and for [the prosecutor] is whether, in fact, it was a form of waterboarding. It was a form of torture. It was a form of softening him up. A nice way of beating him to get him to make a statement that he apparently was not making before.

I don't know what happened before. I have his word against Pantoja's word, and I'm going to go ahead and take Pantoja's word, the officer's word that [Appellant] did not invoke his right to an attorney. Or invoke his right to remain silent.

The trial court thereafter issued written findings of facts and conclusions of law in which it found, among other things: (1) that prior to and at the beginning of the DVD-recorded statement,

Appellant was properly warned of his rights, that Appellant intelligently, knowingly, and voluntarily waived the rights given to him under the United States and Texas Constitutions and the Texas Code of Criminal Procedure; (2) that Appellant was not coerced in any fashion when making his DVD-recorded statement; (3) that Appellant made an independent, informed choice of free will in giving his DVD-recorded statement; (4) that the decision by Appellant to give the DVD-recorded statement was not influence by any factor other than his desire to give said statements; and (5) that at no time did Appellant request the presence of counsel, request to remain silent, or terminate the interview. The trial court concluded as a matter of law that Appellant's recorded statement was made voluntarily while he was in custody, and that the statement met all of the requirements of Texas Code of Criminal Procedure article 38.22.

## DISCUSSION

On appeal, Appellant complains that his Fifth, Sixth, and Fourteenth Amendment rights were violated because the State used Appellant's wife to contravene his right to counsel, his privilege against self-incrimination, and his right not to provide a coerced confession.

Appellant contends that these alleged violations warranted a suppression of his custodial confession at trial and that the trial court committed error in denying his motion to suppress this evidence. We disagree.

### *Standard of Review*

In a suppression hearing, the trial court is the sole finder of fact and may believe or disbelieve all or any part of a witness's testimony. *Wilson v. State*, No. PD-0307-09, 2010 WL 715253, at *3 (Tex. Crim. App. Mar. 3, 2010); *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009); *Alvarado v. State*, 853 S.W.2d 17, 23 (Tex. Crim. App. 1993); *Pace v. State*, 986 S.W.2d 740, 744 (Tex. App.–El Paso 1999, pet. ref'd). The trial court, like any fact finder, may

make reasonable inferences from the evidence presented during a suppression hearing. *Amador*, 275 S.W.3d at 878. Because the trial judge is the sole trier of fact regarding credibility and weight to be given to a witness's testimony, we do not engage in our own factual review of the trial court's decision. *See State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990).

We review a trial court's ruling on a motion to suppress using a bifurcated abuse-of-discretion standard. *Wilson*, 2010 WL 715253, at *3; *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 88-89 (Tex. Crim. App. 1997); *Urquhart v. State*, 128 S.W.3d 701, 704-05 (Tex. App.–El Paso 2003, pet. ref'd); *Krug v. State*, 86 S.W.3d 764, 765 (Tex. App.–El Paso 2002, pet. ref'd). Almost total deference is given to the trial court's ruling on questions of historical fact and application of law to fact questions that turn on an evaluation of credibility and demeanor. *Montanez v. State*, 195 S.W.3d 101, 106 (Tex. Crim. App. 2006), *citing Guzman*, 955 S.W.2d at 89. A trial court's rulings on mixed questions of law and fact that do not turn on the credibility and demeanor of witnesses are reviewed *de novo*. *Id*.

When conducting our review, we view the evidence in the light most favorable to the trial court's ruling on the suppression motion. *Wilson*, 2010 WL 715253, at *3; *State v. Iduarte*, 268 S.W.3d 544, 548 (Tex. Crim. App. 2008); *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007); *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). If the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *Kelly*, 204 S.W.3d at 818. If the trial court has not made a finding on a relevant fact, we imply the finding that supports the trial court's ruling so long as there is some support in the record. *Id*. at 818-19; *see Moran v. State*, 213 S.W.3d 917, 922 (Tex. Crim. App. 2007). Where, as here, the trial court files findings of fact and conclusions

of law, the court's findings will not be disturbed on appeal absent an abuse of discretion. *State v. Wood*, 828 S.W.2d 471, 474 (Tex. App.–El Paso 1992, no writ); *see also Cantu v. State*, 817 S.W.2d 74, 77 (Tex. Crim. App. 1991). If the court's findings are supported by the record, then we are not at liberty to disturb them, and we will only address the question of whether the trial court improperly applied the law to the facts. *Wood*, 828 S.W.2d at 474. A court's ruling regarding a motion to suppress will be upheld if the decision made was based on any correct theory of law applicable to the case. *St. George*, 237 S.W.3d at 725; *Ross*, 32 S.W.3d at 856.

*Applicable Law*

**Right to Counsel**

*Fifth Amendment*

The Fifth Amendment to the United States Constitution accords an individual the right not to be compelled as a witness against himself in any criminal case, and was made applicable to the states by the Due Process Clause of the Fourteenth Amendment. U.S. CONST. AMEND. V; *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). In *Miranda v. Arizona*, the United States Supreme Court determined that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination requires that custodial interrogation be preceded by a warning to an accused that he has the right, among others, to remain silent and to the presence of an attorney during custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008).

The Fifth Amendment right to counsel attaches only when affirmatively invoked by the accused, who must unambiguously and unequivocally invoke his right to counsel before police interrogation must cease. *Miranda*, 384 U.S. at 473-74; *Dinkins v. State*, 894 S.W.2d 330, 351-52 (Tex. Crim. App. 1995). If an accused invokes his right to have counsel present during custodial

interrogation, he is not subject to further interrogation unless counsel has been made available to him unless he, himself, initiates further communication, exchanges, or conversations with police. *Edwards v. Arizona*, 451 U.S. 477, 484-485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Cross v. State*, 144 S.W.3d 521, 526 (Tex. Crim. App. 2004).

When a suspect invokes his right to remain silent, that right may, under certain circumstances, be waived by responding to later police-initiated questioning. *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). The Fifth Amendment bars police-initiated interrogation of an accused who, in the context of custodial interrogation, has previously asserted his right to counsel during such interrogation unless the accused's counsel is actually present. *Hughen v. State*, 297 S.W.3d 330, 335 (Tex. Crim. App. 2009), *citing Minnick v. Mississippi*, 498 U.S. 146, 153, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990) *and Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). An accused, however, can waive his previously-invoked Fifth Amendment right to counsel if: (1) the suspect himself initiates further communication with authorities, and (2) after doing so, validly waives the right to counsel. *Cross*, 144 S.W.3d at 526-27, *citing Oregon v. Bradshaw*, 462 U.S. 1039, 1044-46, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983).

*Sixth Amendment*

The Sixth Amendment provides that a person accused of a crime shall enjoy the right to counsel. *Gideon v. Wainwright*, 372 U.S. 335, 342, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Hughen*, 297 S.W.3d at 334. The Sixth Amendment right to the assistance of counsel does not attach prior to the initiation of adversarial judicial proceedings, which may be initiated by way of formal charge, preliminary hearing, indictment, information, or arraignment. *Montejo v. Louisiana*, —U.S.—, 129 S.Ct. 2079, 2085, 173 L.Ed.2d 955 (2009); *United States v. Gouveia*, 467 U.S. 180, 187-88, 104 S.Ct. 2292, 2297, 81 L.Ed.2d 146 (1984); *Flores v. State*, 299 S.W.3d 843, 851 (Tex. App.–El Paso

2009, pet. ref'd). Upon initiation of the adversarial judicial process, the Sixth Amendment right to counsel guarantees an accused the right to have counsel present at all critical stages of the criminal proceeding. *United States v. Wade,* 388 U.S. 218, 227-28, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Hughen*, 297 S.W.3d at 334. One of these critical stages includes interrogation of an accused by police after charges have been brought. *Brewer v. Williams*, 430 U.S. 387, 401, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Hughen*, 297 S.W.3d at 334.

However, Sixth Amendment rights may be waived if an accused intelligently, knowingly, and voluntarily waives them. *Patterson v. Illinois*, 487 U.S. 285, 292 n.4, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988); *Hughen*, 297 S.W.3d at 334. An accused validly waives his Sixth Amendment right to have counsel present during interrogation when he is read his *Miranda* rights and he agrees to waive those rights. *Montejo*, —U.S.—, 129 S.Ct. at 2085, 2092 (noting also that there is no reason to distinguish an unrepresented defendant from a represented one, for *Miranda* warnings adequately inform each type of defendant, under both the Fifth and Sixth Amendments, of his right to have counsel present during questioning and make him aware of the consequences of a decision by him to waive his Sixth Amendment rights), *citing Patterson*, 487 U.S. at 293 *and overruling Michigan v. Jackson,* 475 U.S. 625, 635-36, 106 S.Ct. 1404, 1410-11, 89 L.Ed.2d 631 (1986) (previously holding that when police initiate interrogation after a defendant's Sixth Amendment assertion, at arraignment or similar proceeding, of his right to counsel, any waiver of that right is invalid); *Flores*, 299 S.W.3d at 852. Thus, the Sixth Amendment does not bar police-initiated interrogation of an accused who has previously asserted his right to counsel. *Montejo*, —U.S.—, 129 S.Ct. at 2085, 2092; *Hughen*, 297 S.W.3d at 335.

**Article 38.22**

Article 38.22, section 3 of the Texas Code of Criminal Procedure sets forth the requirements

to make oral custodial statements admissible at trial and, among other things, codifies the *Miranda* warnings required to be given prior to custodial confessions. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(a) (Vernon 2005); *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). Before an oral statement may be admitted into evidence, the article requires that the accused must be warned that:

> (1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;
>
> (2) any statement he makes may be used as evidence against him in court;
>
> (3) he has the right to have a lawyer present to advise him prior to and during any questioning;
>
> (4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and
>
> (5) he has the right to terminate the interview at any time . . . .

TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(a) (Vernon 2005). The article also requires: (1) that an electronic recording of the statement, which may include a video recording, must be made; and (2) that prior to an accused's statement and, while the recording is being made, the accused must be provided his warnings and must knowingly, intelligently, and voluntarily waive the rights set forth in the warnings. TEX. CODE CRIM. PROC. ANN. art 38.22, §§ 2(a), 3(a)(1)(2) (Vernon 2005).

**Voluntary Statement**

Article 38.21 of the Texas Code of Criminal Procedure provides that a statement of an accused may be used in evidence against him if it appears that the statement was freely and voluntarily made without compulsion or persuasion. TEX. CODE CRIM. PROC. ANN. art. 38.21 (Vernon 2005). The determination of whether a confession is voluntary is based on an examination of the totality of the circumstances surrounding its acquisition. *Penry v. State,* 903 S.W.2d 715, 744

(Tex. Crim. App.), *cert. denied*, 516 U.S. 977, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995). A confession is involuntary if circumstances show that the defendant's will was "overborne" by police coercion. *Creager v. State*, 952 S.W.2d 852, 856 (Tex. Crim. App. 1997). That is, a statement is involuntary if the record shows "official, coercive conduct of such a nature" that any statement obtained thereby is "unlikely to have been the product of an essentially free and unconstrained choice by its maker." *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995). A statement is involuntary and inadmissible if it is induced by a promise that is of some benefit to a defendant, is positive, made or sanctioned by someone in authority, and of such a character as would likely influence the defendant to speak untruthfully. *See Muniz v. State*, 851 S.W.2d 238, 254 (Tex. Crim. App. 1993), *cert. denied,* 510 U.S. 837, 114 S.Ct. 116, 126 L.Ed.2d 82 (1993).

### *Application*

In commencing our analysis, we note that the trial court was able to observe the demeanor and judge the credibility of the witnesses and their testimony through the course of not one but two pretrial hearings on these matters and during trial, as well. We are also mindful that the trial court may believe or disbelieve all or any part of a witness's testimony, even if that testimony is not controverted, because it is the trial court that observes first hand the demeanor and appearance of a witness, as opposed to an appellate court which can only read an impersonal record. *Ross*, 32 S.W.3d at 855.

**Custodial Interviews**

The trial court was able to observe, as we have from our review of the record, that the warnings set forth on the *Miranda* card that was presented to Appellant during his first interview are the same as those set forth in and required by article 38.22. TEX. CODE CRIM. PROC. ANN. art 38.22, §§ 2(a), 3(a)(1)(2) (Vernon 2005). Likewise, the trial court was also able to consider that Appellant

had placed upon the face of the warning card his signature, the date, and the time at which he signed the card. Appellant testified that the first interview lasted approximately one and one-half hours. Although Appellant asserted that he requested counsel during his first interview with the detectives but none was provided to him, the trial court expressly stated that it believed Detective Pantoja's testimony that Appellant had not invoked either his right to an attorney or his right to remain silent during the first interview. We note that Detective Nevarez also testified that Appellant did not invoke his right to an attorney. "'Because the trial court is in the best position to evaluate the testimony, we must defer to the trial court's findings.'" *Green v. State*, 934 S.W.2d 92, 99 (Tex. Crim. App. 1996), *quoting Davis v. State*, 829 S.W.2d 218, 220 (Tex. Crim. App. 1992). The trial court's findings that Appellant did not invoke his right to an attorney nor his right to remain silent during the first interview are supported by the record.

At the beginning of the second interview, and while being recorded, Appellant re-read his *Miranda* warning card from his first custodial interview aloud and stated that he understood his rights. Appellant never invoked any of his rights during this second interview. Again, in making its rulings, the trial court reviewed the video recording of the second interview in which Appellant made his confession to the detectives. Again, the trial court was able to evaluate the demeanor of Appellant and the officers during the recording. Because the trial court's findings of fact regarding Appellant's waiver of counsel are supported by the record, we cannot disturb them on appeal. *Wood*, 828 S.W.2d at 474.

We next determine *de novo* whether the trial court correctly applied the law to these facts. Because the Fifth Amendment right to counsel attaches only when affirmatively invoked by the accused, who must unambiguously and unequivocally invoke his right to counsel before police interrogation must cease, and because Appellant did not invoke his Fifth Amendment right to

counsel, we find that the trial court properly applied Fifth Amendment law to these facts. *Miranda*, 384 U.S. at 473-74; *Dinkins*, 894 S.W.2d at 351-52. Likewise, although his Sixth Amendment right to counsel attached because he was arrested pursuant to a felony criminal complaint, because Appellant had been provided his *Miranda* warnings and because he had waived his right to counsel, we find the trial court properly applied Sixth Amendment law to these facts. *Montejo*, —U.S.—, 129 S.Ct. at 2085, 2092, *citing Patterson*, 487 U.S. at 293; *Hughen*, 297 S.W.3d at 335.

Consequently, because the trial court did not abuse its discretion when it denied Appellant's motion to suppress his custodial statements, we overrule this issue on appeal.

**Voluntariness and Coercion**

In essence, Appellant next complains that his custodial statement was involuntarily made. The trial court considered Appellant's pretrial complaint that his wife was used as a "police agent" for the purpose of securing a confession but never expressly ruled that she was or was not acting as an agent of the state. Instead, the trial court ruled that the recorded conversations of Appellant and Patricia were privileged spousal communications that would be suppressed.[1] When a trial court has not made a finding on a relevant fact in a suppression hearing, we imply the finding that supports the trial court's ruling so long as there is some support in the record. *Kelly*, 204 S.W.3d at 818-19; *see Moran v. State*, 213 S.W.3d 917, 922 (Tex. Crim. App. 2007).

Here, Detective Pantoja testified that Appellant asked to see his wife and, in turn, Detective Pantoja asked her if she was willing to speak with Appellant. Appellant's wife, Patricia, first testified that Detective Pantoja asked her to see if Appellant would be able to give her any information about what had happened and she "understood" that if she was unable to get the

---

[1] The recorded communications between Appellant and his wife were, in fact, introduced into evidence at trial by Appellant.

information, her family would not get their home back. On cross-examination, Patricia clarified that it "seemed" to her that the family would be unable to return home if Appellant did not say anything but agreed that Detective Pantoja never said this to her and it was just something "in [her] mind."

At the second suppression hearing, Patricia testified that Detective Pantoja told her that if Appellant did not "say anything," they would not be able to "get" their home. The trial court was presented with this conflicting testimony, clearly believed Detective Pantoja's testimony over that of Appellant and Patricia and we afford due deference to that decision. We also note that in his statement, Patricia's brother, George, explained that the officers had informed them that no one could return to the family home until the investigation was complete. In making its rulings, the trial court reviewed the video recording that contained the conversation between Appellant and his wife. In its written findings of fact and conclusions of law, the trial court found that Appellant's statement was not coerced in any fashion, was made pursuant to an independent, informed choice of free will, and was not influenced by any factor other than his desire to give the statements. The trial court concluded as a matter of law that Appellant's recorded statement was made voluntarily while he was in custody, and that the statement met all of the requirements of Texas Code of Criminal Procedure article 38.22. We also note from our review of the record that Patricia never told Appellant, "The police told me to ask you to state what happened," or any words to that effect. Considering this evidence, we imply a finding that Appellant's wife was not acting as an agent for the police. *Kelly*, 204 S.W.3d at 818-19; *see Moran*, 213 S.W.3d at 922.

Regarding Appellant's assertion that he made his statement because of his wife's emotional state, we again defer to the trial court's assessment of historical fact, noting that it was free to disbelieve Appellant's statements that he made his custodial confession due to her emotional state. *See Johnson v. State*, 68 S.W.3d 644, 652-53 (Tex. Crim. App. 2002). We note that no

communications occurring between Appellant and his wife were ever utilized by the detectives to sway or prompt Appellant to provide his recorded custodial statement. In fact, there is no indication that Appellant ever knew during his custodial statement that the detectives had been previously monitoring the spousal communications. The recording does show, however, that Appellant re-read his *Miranda* warning card, which complied with the requirements of article 38.22, that he stated that he understood his rights, and that he freely waived those rights. Giving almost total deference to the trial court's determination of historical facts based on credibility of the witnesses, we do not find that there was any coercion as alleged and we find that the trial court correctly determined that Appellant's custodial statement was voluntarily made and could properly be used at trial. TEX. CODE CRIM. PROC. ANN. art. 38.21 (Vernon 2005); *Penry,* 903 S.W.2d at 744. Accordingly, because the trial court did not abuse its discretion by overruling Appellant's motions to suppress his custodial statement, we overrule this issue on appeal.

## CONCLUSION

The trial court's judgment is affirmed.

GUADALUPE RIVERA, Justice

June 23, 2010

Before Chew, C.J., McClure, and Rivera, JJ.

(Do Not Publish)