



# MEMORANDUM OPINION

No. 04-10-00586-CR

Emmanuel **SUAREZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 186th Judicial District Court, Bexar County, Texas
Trial Court No. 2009CR10403A
Honorable Maria Teresa Herr, Judge Presiding

Opinion by:    Catherine Stone, Chief Justice

Sitting:      Catherine Stone, Chief Justice
             Sandee Bryan Marion, Justice
             Phylis J. Speedlin, Justice

Delivered and Filed:   August 10, 2011

AFFIRMED

Emmanuel Suarez appeals from a judgment sentencing him to life imprisonment for the murder of Justin Rodriguez. In two issues, Suarez complains the trial court erred by: (1) denying his motion to suppress his recorded confession; and (2) admitting two crime scene photographs of the victim during trial. We affirm the trial court's judgment.

## BACKGROUND

Gilbert Vargas and his girlfriend, Lauren Orosco, attended a party at Rodriguez's apartment, where Vargas got into a physical altercation with several individuals. Vargas was visibly upset following the altercation and left the party. As he was leaving, Vargas commented that he would return.

Vargas spoke to his friend Richard Lopez after he left the party and arranged to meet his friend at a Jack in the Box restaurant. Richard, who was accompanied by three other individuals, Vincent Lopez, Felix Perez, and Suarez, arrived at the restaurant together in Richard's vehicle. Vargas spoke with the men,[1] and they all decided to go back to Rodriguez's apartment. Vargas and his girlfriend drove their vehicle back to the apartment complex, while Richard, Vincent, Felix, and Suarez followed in Richard's vehicle.

Rodriguez and two of his friends, Irael Guerra and Jeff Perez, were standing outside Rodriguez's apartment when Vargas and the other men arrived. Vargas opened the passenger side door of Orosco's vehicle and began yelling and cursing at Rodriguez. In the meantime, Richard, Vincent, Felix, and Suarez drove up behind Vargas and Orosco. Suarez pulled out a .44 caliber pistol that Vargas had given to him a little while earlier and began firing multiple rounds at Rodriguez and his friends. Two of the rounds struck Rodriguez, while another one struck Guerra. After Suarez finished firing, Vargas and the others fled the scene. Rodriguez, who was fatally wounded, died at the scene.

Although the police had Vargas's information and a description of the vehicle responsible for the drive-by shooting, they could not locate any of the individuals responsible for Rodriguez's death that night. The police eventually located Vargas and Orosco a few days later,

---

[1] A surveillance camera from the Jack in the Box restaurant recorded the meeting between Vargas and the other men.

and Orosco agreed to cooperate with the police. Orosco identified all of the individuals involved in the shooting, including Suarez, and the police issued a warrant for Suarez's arrest.

Suarez showed up at the police station following the issuance of the warrant for his arrest and asked to speak with detectives about Rodriguez's death. Officers arrested Suarez due to the outstanding arrest warrant and placed him in an interview room to speak with a detective. Detective David Snow then met with Suarez to question him about the shooting.

The video recording of Suarez's interview with Detective Snow shows that Suarez was provided with water and that he was not restrained when he was introduced to the detective. At the beginning of the interview, Detective Snow told Suarez that he was under arrest and informed him of his *Miranda* rights. When Detective Snow asked Suarez whether he understood his rights, Suarez responded by nodding his head up and down and stating "yes, sir." Although Detective Snow asked Suarez whether he understood his rights, the detective did not explicitly ask Suarez if he was waiving those rights. Detective Snow then proceeded to question Suarez about his activities on the day of the shooting.

During the course of the initial forty-five minutes of the interview, Suarez repeatedly denied having any involvement in Rodriguez's death. He also refused to acknowledge that he had met with Vargas, Richard, Vincent, and Felix prior to the shooting. Suarez's denials caused Detective Snow to call Suarez a "liar" and remark that Suarez was "making [himself] look like shit." Detective Snow then showed Suarez the Jack in the Box surveillance footage showing him at the restaurant with the other suspects. Suarez, however, still refused to acknowledge that he was at the Jack in the Box before the shooting. Detective Snow concluded that Suarez was not going to reveal the truth to him and terminated his discussion with Suarez, stating "Good luck to

you Emmanuel, okay, I will see you in court." The video then shows Detective Snow exiting the interview room.

Approximately five minutes after Detective Snow exited the interview room, Suarez called for the detective. When Detective Snow returned to the interview room, Suarez asked the detective to sit down so that he could tell the detective the truth about the shooting. Suarez then asked Detective Snow whether the interview was being recorded, stating "because you might want to record this." At this point in the video, Suarez began to tell Detective Snow about the events surrounding the shooting and admitted that he was at the Jack in the Box with the other men prior to the shooting. Suarez confessed to shooting Rodriguez and told Detective Snow that he received the murder weapon from Vargas. Although Suarez admitted to shooting Rodriguez, Suarez claimed he did not intend to harm anyone — just scare them.[2] The video shows that once Suarez provided Detective Snow with his confession, the detective left the interview room to get Suarez some more water. When Detective Snow returned to the interview room, he notified Suarez that their interview was in fact being recorded.

During the course of his interview with Detective Snow, Suarez appeared calm and, for the most part, intelligible and responsive. Suarez did not appear intoxicated or under the influence of any intoxicants or drugs. Moreover, Suarez never invoked any of his constitutional or statutory rights before, during, or after giving his statement. Suarez appeared eager to speak with Detective Snow upon calling the detective back into the interview room, asking the officer to stop talking so that he could continue telling him about the incident.

Suarez was charged with murder and moved to suppress his recorded confession, asserting his statement was inadmissible because he had not expressly waived his rights prior to giving the statement. The trial court held a hearing on Suarez's motion to suppress, and it heard

---

[2] According to Suarez, he had no idea how he hit anyone because he was not aiming the gun when he fired it.

testimony from Detective Snow at the hearing. The court ultimately concluded that Suarez voluntarily gave his confession. The court also found Suarez knowingly and intentionally waived his rights. Thus, the trial court ruled that Suarez's recorded statement was admissible and denied the motion to suppress.

At the conclusion of his trial, Suarez was convicted by the jury of murder. The jury assessed a life sentence for Suarez's crime, and the trial court sentenced him accordingly. Suarez's motion for new trial was denied by the trial court and this appeal followed.

### MOTION TO SUPPRESS

In his first issue, Suarez asserts the trial court erred in denying his motion to suppress his oral statement to Detective Snow. We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007). When reviewing a trial court's ruling on a motion to suppress, we afford almost total deference to determinations of historical facts, especially when those determinations involve assessment of witness credibility and demeanor. *Masterson v. State*, 155 S.W.3d 167, 170 (Tex. Crim. App. 2005). We give the same deference to determinations of mixed questions of law and fact if their resolution depends upon witness credibility and demeanor. *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000). However, we review *de novo* mixed questions of law and fact that do not depend on an evaluation of credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

If the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). If the trial court has not made a finding on a relevant fact, we imply the finding that supports the trial court's ruling so long as there is some

support in the record. *Id*. at 818-19; *see Moran v. State*, 213 S.W.3d 917, 922 (Tex. Crim. App. 2007). We will uphold a trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *St. George*, 237 S.W.3d at 725.

For a statement that stems from a custodial interrogation to be admissible, the accused must knowingly, intelligently, and voluntarily waive his rights. *Joseph v. State*, 309 S.W.3d 20, 24 (Tex. Crim. App. 2010). A waiver need not assume a particular form and may be inferred from the actions and words of the accused. *Id.* The State bears the burden of proving a valid waiver by a preponderance of the evidence. *Id.*

In evaluating whether a waiver is knowingly, intelligently, and voluntarily made, a court must determine whether: (1) the relinquishment of the right was voluntary by determining whether it was the product of a free and deliberate choice rather than intimidation, coercion, or deception; and (2) the waiver was made with full awareness of the nature of the rights being abandoned and the consequences of the decision to abandon it. *Id.* at 25. "Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). In reviewing the totality of the circumstances, we may consider the defendant's experience, background, and conduct. *Id.*

Here, the totality of the circumstances surrounding Suarez's interview with Detective Snow show that Suarez knowingly, intelligently, and voluntarily waived his rights. Detective Snow orally advised Suarez of his *Miranda* rights, which informed Suarez that he had the right to remain silent, to not make a statement to anyone, and to have an attorney appointed to

represent him. When asked if he understood his rights, Suarez responded affirmatively and began to speak with Detective Snow.

Suarez did not request an attorney or ask to terminate his interview at any time. In addition, the record does not show any evidence of intimidation or coercion by Detective Snow. Although the videotape of Suarez's interview demonstrates Detective Snow called Suarez a "liar" and told him that he was "making [himself] look like shit," such interrogation techniques are not the type of "brutal 'third-degree' techniques" that would render Suarez's statement involuntary. *See Estrada v. State*, 313 S.W.3d 274, 297 (Tex. Crim. App. 2010) (concluding appellant's statement was voluntary despite interrogation techniques of repeated accusations of criminal conduct and assertions that appellant was lying).

The record shows that Suarez called Detective Snow back into the interview room on his own accord to speak "about the truth" shortly after the detective ended their discussion and walked away. Suarez was quite eager to discuss the events surrounding the shooting at this juncture, and he made sure to advise Detective Snow to record his statement. Suarez immediately began providing a detailed account of the events surrounding the shooting and, at one point, even asked Detective Snow not to interrupt him so that he could finish his story. Suarez's conduct confirms that he knowingly, intelligently, and voluntarily waived his rights. We therefore conclude the trial court did not err by denying Suarez's motion to suppress and overrule Suarez's first issue on appeal.

### CRIME SCENE PHOTOGRAPHS

In his second issue, Suarez argues the trial court erred by admitting two crime scene photographs of Rodriguez's body. Specifically, Suarez claims this evidence was inadmissible because it was more prejudicial than probative under Texas Rule of Evidence 403. "We review

the trial court's decision to admit or exclude evidence, as well as its decision as to whether the probative value of evidence was substantially outweighed by the danger of unfair prejudice, under an abuse of discretion standard." *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010), *cert. denied*, 2011 WL 1258305, at *1 (U.S. June 6, 2011) (No. 10-9833). A trial court does not abuse its discretion unless its determination lies outside the zone of reasonable disagreement. *Id.*

Rule 403 allows for the exclusion of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. TEX. R. EVID. 403. "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Threadgill v. State*, 146 S.W.3d 654, 671 (Tex. Crim. App. 2004). "[A] proper Rule 403 analysis by either the trial court or a reviewing court includes, but is not limited to, the following factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence." *Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004). In a Rule 403 analysis involving photographs, the following additional factors are relevant: (1) the number of photographs; (2) their size; (3) whether they are in color or black and white; (4) whether they are gruesome; (5) whether a body is clothed or naked; and (6) whether the body has been altered by an autopsy. *Id.*

Here, during the testimony of paramedic Richard Vega concerning the nature of the victim's injuries, the trial court permitted the State to introduce two photographs of Rodriguez's shirtless body after he was pronounced dead by medical personnel. The photographs are color photographs and approximately five by seven inches in size. State's Exhibit 21 is a photograph of Rodriguez's torso lying amidst bloody towels and several medical items. It further shows the

bloody wound Rodriguez sustained to his rib area. State's Exhibit 22 is a photograph of Rodriguez rolled onto his side and shows a bloody wound to his back. The two photographs are gruesome in the sense that they show blood and open wounds, but they are not especially repugnant for a murder case. Vega testified that the two photographs fairly and accurately depict Rodriguez's wounds.

Suarez essentially complains that the trial court should have excluded Exhibits 21 and 22 because they are gruesome and the issue of the cause of the victim's death was presented by other evidence. Contrary to Suarez's argument, however, we believe the trial court acted within its discretion when it admitted Exhibits 21 and 22 into evidence. The exhibits in question helped the State illustrate Vega's testimony by depicting both the crime scene and the victim's injuries. The photographs were thus probative and necessary for the State in developing its case. *See Shuffield v. State*, 189 S.W.3d 782, 787–88 (Tex. Crim. App. 2006) (concluding photographs were probative as they depicted both the crime scene and the victim's injuries); *Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999) ("Visual evidence accompanying testimony is most persuasive and often gives the fact finder a point of comparison against which to test the credibility of a witness and the validity of his conclusions."). Although the crime scene photographs of Rodriguez's body may appear somewhat graphic or gruesome, they are no more gruesome that the facts of the offense itself. *See Williams v. State*, 958 S.W.2d 186, 196 (Tex. Crim. App. 1997); *see also Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995) ("But when the power of the visible evidence emanates from nothing more than what the defendant has himself done we cannot hold that the trial court has abused its discretion merely because it admitted the evidence. A trial court does not err merely because it admits into evidence photographs which are gruesome."). The record further shows that the State did not spend a lot

of time presenting the photographs to the jury. Given these circumstances, we conclude the trial court did not abuse its discretion in determining that the photographs are more probative than prejudicial. Suarez's second issue on appeal is therefore overruled.

## CONCLUSION

Based on the foregoing, the judgment of the trial court is affirmed.

Catherine Stone, Chief Justice

DO NOT PUBLISH